EUGENIA BETTINGER, as Administrator, etc., Appellee, v. HOMER LORING et al., as Receivers, Appellants.

**NEGLIGENCE:** Street Railways—Highway Crossings—Care Required—Jury Question. The care required in operating cars over highway crossings must be in proportion to the peril to be guarded against. In instant case, *held* that the record presented a question of negligence for the jury.

PRINCIPLE APPLIED: Deceased, traveling northwest, was struck and killed at a much used railroad crossing, *very near* the city limits. Both roadway and railway were obscured by deep cuts. The railroad at point of crossing ran north and south, the public road southeast and northwest. The railroad approach to crossing was up-grade and around curves. A curve, through 9 to 15-foot cut, brought train into view 150 feet south of crossing, on the banks of which cut weeds and brush grew from 2 to 4 feet high. From point 150 feet east of crossing, no view of track to the south was obtained until one was nearly or quite upon east rail. There was no living witness. No one saw deceased after he passed a point 75 feet east of crossing, he then driving west. Railroad employees claimed they stopped half mile south of crossing, cut train in two, took first section very slowly to a point approaching crossing, stopped 15 seconds, sounded whistle, looked down public road 150 feet to the east, saw no one, then moved at three miles per hour 400 feet northward and across the cross-

ing, left cars and started back for second section, and at the crossing discovered the carriage on one side of track; deceased on the other side thereof, close to rail, mortally wounded, with a horse on each side of the cattle guard. Blood and hair were found under sill of east side of fourth car from engine. One leg of deceased was crushed and portions of clothing sheared off and left between rails. The ground showed wheel tracks veering sharply to the north near the crossing. A witness who heard no bell or whistle, and who was driving to the east, passed rapidly over the crossing ahead of the train while it was in the cut and moving northward. She met deceased, 75 feet east of the crossing, driving rapidly, his team quite sweaty. No showing was made that deceased was familiar with the crossing except that he was a livery stable keeper in the city. A rule of the company required full stop at this particular crossing, and required constant vigilance and look-out at all obscure crossings. *Held,* the question of defendant's negligence was for the jury, not for court.

**NEGLIGENCE: Death—No Eyewitness—Presumption of Care.** It
2   may be inferred, in the absence of an eyewitness to an accident, that a deceased, prompted by the instinct of self-preservation, did what an ordinarily prudent person would do to avoid injury.

PRINCIPLE APPLIED: (In addition to above facts). Beer bottles were found scattered around the crossing. A witness noticed smell of liquor on deceased's breath while others did not. At other points of the drive, deceased was driving rapidly, swaying in his seat, without firm control of team. Other evidence that deceased was not intoxicated, and a sober man. *Held,* the question of contributory negligence was for jury.

**NEGLIGENCE: Railroads—Public Crossings—Statutory Signals—**
3   **Additional Precautions.** A railway company must do those things which will render the proper use of public crossings reasonably safe. The sounding of a whistle and bell, as required by statute, does not necessarily constitute a full discharge of their duty.

PRINCIPLE APPLIED: In the instant case (see condensed statement of fact) the jury was properly told that if the sounding of the bell and whistle was not sufficient to render the proper use of the crossing reasonably safe, the company was under obligation to provide such *other* precautions as might reasonably be necessary for that purpose, whether it might be the employment of a flagman or such other expedient as ordinary prudence might dictate.

**DEATH:** Damages—Basis in Evidence to Estimate—Sufficiency. 4 There must be fair and substantial basis in the evidence for the assessment of damages. Record, in instant case, *held* to furnish sufficient basis for estimate on value of life of deceased.

PRINCIPLE APPLIED: Deceased was 50 years old, left $1,300 of property, $2,500 in life insurance, was of industrious habits, had suffered some from rheumatism but his earning capacity was not lessened thereby. There was no showing that he had usually worked for wages and no definite showing as to earning capacity. *Held*, to furnish sufficient basis for fair estimate on value of his life to his estate.

**EVIDENCE:** Res Gestae — Test — Instinctiveness — Coincidence in 5 Time. The test whether declarations are *"res gestae"* is: Were the facts talking through the party, or the party talking about the facts? Instinctiveness is the requisite, not necessarily precise coincidence in point of time.

PRINCIPLE APPLIED: A motor car passed a crossing, the employees claiming they did not see deceased or know he had been hit at the crossing. The car proceeded at least 250 feet beyond the crossing, placed certain cars upon a side track and then returned to the crossing where they discovered deceased. "About this time" or a few minutes after deceased was discovered the motorman said: "We had a heavy load and could not stop the train. *Held*, part of the *res gestae.*

**APPEAL AND ERROR:** Error—Omnibus Assignment. An omnibus 6 assignment of error is not sufficient.

**APPEAL AND ERROR:** Allegation Unsupported by Evidence—Re- 7 fusal to Strike. A failure to withdraw from the jury an allegation of negligence, as to which there was no evidence, is without prejudice, though included in the statement to the jury, when no instruction was asked or given with reference thereto.

*Appeal from Webster District Court.*—HON. R. M. WRIGHT, Judge.

SATURDAY, DECEMBER 19, 1914.

ACTION at law to recover damages for the death of Eugene Bettinger, who is alleged to have lost his life by the defend-

ant's negligence. Verdict and judgment for plaintiff and defendants appeal.—*Affirmed.*

*Dyer & Dyer,* for appellants.

*Kenyon, Kelleher & O'Conner,* and *Frank Maher,* for appellees.

WEAVER, J.—The company of which defendants are receivers owns a line of electric railway extending from Fort Dodge to Des Moines and other points. On August 12, 1911, plaintiff's intestate was struck and mortally injured by one of the company's trains upon a highway crossing in Webster county on the border of the city of Fort Dodge, and this action is brought to recover the damages thereby occasioned to his estate. In support of such claim it is alleged that the collision is chargeable to the negligence of the persons having charge and control of the movement of the train in the following particulars:

1st. That they were negligent in failing to exercise reasonable care to stop the train and avert the injury after they discovered or knew of the peril to the deceased.

2nd. That they were negligent in failing to give proper signals or warnings of the approach of the train; and,

3rd. That defendants, their agents and employees, were negligent in operating trains over said crossing, which by reason of the manner of its construction and its surroundings rendered its use peculiarly dangerous, without employing a watchman or making use of other proper safety device.

Answering plaintiff's claim, defendants deny the charges of negligence on its part, allege that the collision was due to the negligence of the deceased, and further say that if the crossing was especially or peculiarly dangerous the deceased knew it and undertook its use fully appreciating the risk thereof.

I. Appellant's argument is first directed to the proposition that there is no evidence of defendant's negligence and

no sufficient showing that deceased exercised due care for his own safety.

It is conceded by both parties in argument that the crossing in question is obscure and dangerous. The railway at this point is laid through a somewhat broken and hilly tract of land bordering the course of the Des Moines river. Immediately at the crossing the railroad runs substantially north and south and intersects the highway, which here extends from the southeast to the northwest, at a somewhat sharp angle. The approach of the railway from the south is up grade and around curves. At a point about 150 feet south of the crossing an approaching train comes around a curve and through a cut, the depth of which is variously stated by the witnesses as from nine to fifteen feet, and upon the banks of which was a growth of weeds and brush from two to four feet in height and a few small trees. Owing to these conditions, the curve in the track, the high banks and other obstructions, one who is driving in an ordinary carriage along the highway from the east after passing a point about 150 feet distant from the crossing obtains no view of the track to the south until his team is nearly or quite upon the east rail.

1. NEGLIGENCE: street railways: highway crossings: care required: jury question.

On the day in question the deceased, who was conducting a livery stable in the city of Fort Dodge, had been employed to drive one Frund to a mill situated some two miles beyond this crossing and was returning alone to the city when his injury occurred. There is no living eyewitness of the collision, for strangely enough, none of the three employees accompanying the train appear to have seen the deceased or to have known of the collision until later in the day. According to their version of the incident they came from the south with a train of freight cars to a point a half mile or more from the crossing, where they cut the train in two, proposing to take it up the grade in sections. They say they proceeded with the first section of ten or fifteen cars very slowly until as they approached the crossing they came to a full stop. Then after

an interval of fifteen seconds and sounding the whistle they moved on slowly to a switch some four hundred feet farther to the north where they placed the cars on a sidetrack and then started back with their motor after the second section of the train. When this return movement was begun and they approached the crossing they discovered for the first time the body of Mr. Bettinger, the wreck of his carriage, and his horses standing on each side of the cattle guard and one of them badly wounded. It should also be said that the trainmen testifying in the case further say that when they stopped the first section at the crossing, they looked down the road to the east a distance of 150 to 160 feet, the direction from which deceased must have appeared, and saw neither him nor any other person. The only explanation these witnesses can give of the collision is by way of theory or conclusion that deceased recklessly or blindly drove his team into collision with the train after the motor had crossed the highway but before the crossing was fully cleared by the attached cars. This theory, they say, and counsel argue, is borne out by the fact that upon subsequent examination blood and hair were found under the sill on the east side of the fourth car from the motor. But this is at best a matter of argument or deduction, the correctness of which the court cannot pass upon as a matter of law. Nor do we find the record such that we can say as a matter of law that there is no evidence of want of due care in the handling of the train. The crossing, as we have said, was a peculiarly dangerous one and it was much used by the public. The care which the law requires of a company operating cars over or across a public highway is care which is reasonably proportioned to the peril to be guarded against. *Kinyon v. R. R. Co.*, 118 Iowa 349; *Gray v. R. R. Co.*, 143 Iowa 268; *Gray v. R. R. Co.*, 160 Iowa 1.

And the facts being shown, the question whether they answer the requirements of reasonable care under all the circumstances is ordinarily for the jury to answer. It is true that the trainmen, or at least two of them, testify that they

came to the crossing slowly, made a full stop and then moved on very slowly, and if this is to be accepted literally it is very possible that the court would not permit a finding of negligence to stand. But while there is no eyewitness to deny these statements, it can hardly be questioned that the facts and circumstances otherwise established are such as may properly have lessened the weight and value of such testimony in the estimation of the jury, or to suggest the thought that the trainmen were testifying more from their memory of their rules and customs than from a specific recollection of the actual occurrence. If, as they say, when the motor crossed the road there was no one approaching upon the 160-foot stretch of highway to the east, it is quite incredible that deceased should have covered that distance and crashed into collision with the fourth car behind the motor. Again, while the fact is the subject of dispute, there was testimony which, if believed by the jury, would sustain the finding that when first discovered the helpless body of the deceased was lying close to the rail on one side of the track while the wrecked carriage was on the other—a circumstance which tends to discredit the suggestion that deceased drove midway into the side of the moving train. Still again, though it is perhaps not an impossible result, it is not easy to understand how upon the theory advanced by appellant the deceased sitting in his carriage could have been thrown under the wheels of the moving train. That he was under the wheels is quite clearly shown from the fact that his foot or leg was crushed and portions of his clothing "sheared" off and left lying between the rails. Indeed, except for the insistence of the trainmen that they saw nothing of the deceased or his team or carriage at or near the crossing until their return trip, the facts and circumstances disclosed are all quite consistent with the conclusion that when struck by the train deceased was in the act of crossing the track; or, in other words, that he or his team came upon the track slightly in advance of the train. There is evidence that wheel tracks which may have been made by

his buggy veered sharply to the north near the track and it is possible that the deceased finding the train upon him sought to swing the team out of danger, or that the team in its fright instinctively took that course and was immediately overtaken and the outfit broken and scattered by the impact. That these things could have happened, or that deceased could have driven into the side of the train and met his death without being discovered, if the train had stopped a few feet south of the crossing and then have moved forward at three miles per hour while the trainmen looked down the highway and found it clear, is something so out of harmony with the ordinary experience and observation of mankind that the court cannot say that the jury was manifestly wrong in refusing to give it controlling weight and influence in deliberating upon the verdict.

There is still other evidence having direct bearing upon this feature of the case. The defendant's witness, Mrs. Jones, driving in the opposite direction passed over the crossing just as the train was in the cut on the south. Her team was moving rapidly and she met deceased going toward the crossing at a point estimated at 75 feet east of it. He also was driving at a good pace. This was the last time he was ever seen until after the collision. Now if, as the trainmen claim, the train after emerging from the cut slowed down to a full stop, which the motorman estimates at fifteen seconds, and then resumed its movement at a very low speed, it seems hardly possible that deceased driving in the manner described should not have covered that distance of 75 feet and safely made the crossing.

The duty of the trainmen with respect to crossings was the subject of an established rule of the company introduced in evidence by the defendants. By the terms of this rule all trains are required to come to a "full stop" at this particular crossing and trainmen are directed to be on "constant lookout for traffic on all public highways, using the greatest possible caution in approaching all obscure public highways." The testimony of Mrs. Jones is that the train was in motion

when she saw it. She heard no bell or whistle. We do not understand the trainmen to claim that the whistle was sounded except at the moment of starting after the alleged stop. The physical facts and circumstances of the collision, the conditions existing at the crossing when the deceased was discovered, are more consistent with the theory that the train did not stop but continued over the crossing at a comparatively high rate of speed and without the caution which the acknowledged obscurity and danger of such crossing required, than they are with the theory of due care on the part of defendant's employees.

It follows of necessity that the question of defendant's negligence was for the jury and not for the peremptory direction of the court.

II. Neither can we dispose of the issue of contributory negligence as a matter of law. So far as known or shown by the record there was no eyewitness of the collision and unless the proved circumstances make it clear beyond controversy that it could not have occurred had he exercised the care of a person of ordinary prudence, his administratrix in this case is entitled to the presumption that deceased was exercising due care. *Gray v. R. R. Co.*, 143 Iowa 268, 276, and cases there cited.

2. NEGLIGENCE: death: no eyewitness: presumption of care.

Upon the facts touching this issue the cited case is quite in point with the one at bar. There, as here, the crossing was obscure and the train approached through a cut and, as in this case, the railroad track was visible to the deceased as he came along the road at some distance from the crossing but did not again come into view until he drove nearly or quite up to the crossing. In the *Gray* case the deceased was last seen driving his team at a trot in the direction of the crossing and not to exceed 55 feet therefrom, a circumstance which is duplicated in this case, save in the matter of distance, which may have been 75 feet. We there held, as we think correctly, that these facts did not authorize the court to say as a matter of law

that deceased continued his rapid pace up to the moment of collision or did not, as he reached the zone of danger, do those things which the prudence of the ordinary man required at his hands.

It is argued that deceased was intoxicated and driving in a reckless manner. There is evidence tending to show that at certain other points or places along the line of his drive he was driving at a rapid gait, that he swayed or bounced in his seat and did not appear to have firm control of the team. It is also shown that scattered at or near the place of collision were found beer bottles, and a witness for defense who assisted in moving the injured man says he observed the smell of liquor on his breath. On the other hand, there is much evidence tending to show that he was not intoxicated and was capable of caring for himself. The person whom he had taken from Fort Dodge to the mill testifies that to all appearance deceased was sober when he started homeward a very short time before the accident and, so far as witness knows, he had no liquor with him, and witness observed nothing about him indicating intoxication. The woman who met him near the crossing was herself absorbed in managing a frightened or spirited team and the most she can say is that the team of deceased was "trotting, coming right down and I gave him the road and went on," noticing as they passed that the horses were lathering in sweat. Other witnesses who helped care for the injured man say that they noticed no odor of liquor upon him and that the horses showed no marked signs of overdriving. The only evidence offered on the subject tends to show deceased a man of sober habits. It is quite apparent that all this testimony was competent upon the question of due care by the deceased but it is not of such conclusive character as to preclude its submission to the jury. The court cannot say as a finality that deceased should have stopped or looked or listened at any particular place or outlook upon his approach to the crossing or that he should have left his carriage and gone forward far enough to look down the cut before venturing upon

the crossing. The question is not whether he did or did not observe any specific act of care or caution but whether he did what a fairly prudent person ought to have done under the circumstances; and in the absence of eyewitnesses of circumstances indubitably indicating the contrary, he is presumed to have done whatever reasonable care required at his hands. *Dalton v. R. R. Co.*, 104 Iowa 26; *Hendrickson v. R. R. Co.*, 49 Minn. 245.

We may also add, as before noted, that after passing a point some distance to the east, the traveler going toward the crossing could not discover the approach of a train until very near the track and if it be true, as defendants show, that their employees were required or made it a rule to stop all trains on the safe side of this crossing, it was then a fair question for the jury whether deceased as a reasonably prudent man would not have been justified in placing some degree of reliance thereon in determining what measures of caution he should observe in using the highway at that point.

For the reasons stated we hold the trial court did not err in refusing to direct a verdict for the defendant because of contributory negligence by the deceased.

III. Error is assigned upon the giving of certain instructions.

The court stated to the jury the statutory requirements for the sounding of a whistle and the ringing of a bell on the approach of a locomotive or a motor to a public crossing and said in substance that if owing to the surroundings or the peculiar danger attending the use of a particular crossing the statutory signals were insufficient to render the proper use thereof reasonably safe, the company was bound to provide such other precautions as might reasonably be necessary for that purpose, whether it might be the employment of a flagman or such other expedient as ordinary prudence might dictate. Counsel concede that "if the surroundings in this case had been such that the sounding of the bell

3. Negligence: railroads: public crossings: statutory signals: additional precautions.

or whistle would have been ineffective to warn the traveler and the trains did not stop at the crossing it might be said that ordinary care on the part of the company would require that electric bells or gates or perhaps a watchman be maintained at this crossing;'' but, they say, the circumstances shown negative the necessity of such extraordinary caution, because it affirmatively appears not only that the company did provide a rule requiring its trains to stop at this crossing but the train which collided with deceased did in fact stop before entering upon the public road. That the crossing was a peculiarly obscure and dangerous one, or, to say the least, the jury could properly so find, is too clear from the record for discussion. Indeed, as we have before mentioned, this condition of the crossing is expressly admitted in argument. It was also near the city of Fort Dodge, the highway was a means of approach to the gypsum mills in that vicinity and was largely used by the public and frequent trains were passing upon the railway. This combination of circumstances presents a plain case where a finding that something more than the statutory signals was necessary to the reasonable safety of the crossing has sufficient support in the record and the court did not err in charging the jury upon the law applicable thereto. Nor is such instruction rendered inapplicable by the defendants' evidence that the train in this instance stopped as it approached the crossing; for, as we have seen, it was within the province of the jury to discredit the testimony to that effect. We are cited in this connection to the case of *Dyson v. R. R. Co.*, 57 Conn. 9, where it seems to be held that if the engineer in charge of a train gives the statutory signals his duty to exercise due care is fully discharged, it being there said that the legislation prescribing precautions to be observed at crossings ''is exhaustive and defines the whole duty of railroad companies in the matter to which it relates.'' It is sufficient for us to say that this conclusion is not in harmony with the law of this state and impresses us as being radically unsound in principle. See *Hart v. R. R. Co.*, 56

Iowa 166, 170. The case of *Haas v. R. R. Co.*, 47 Mich. 401, 11 N. W. 216, also cited by appellant, holds that where one who is familiar with a crossing, the approach to which is only partially obscured, undertakes to contest the passage with a train which he knows is due and is close at hand and is seen to drive his team into collision with the side of the locomotive, the fact that there was no statutory warning sign erected at the crossing was immaterial and he is chargeable with contributory negligence. There is no showing here that the deceased was familiar with the peculiar conditions of the crossing except as we are asked to infer it from the fact that he was proprietor of a livery business in the neighboring city of Fort Dodge. He was not seen to drive into a train already in possession of the crossing; there is a presumption that he did not do such a foolhardy thing; and there are facts in evidence tending to sustain the theory that he was already upon the crossing when struck by the train. In rendering the decision above referred to, the Michigan court takes pains to say that the employment of a flagman might become the duty on the part of the company when the danger is altogether exceptional or there is something in the case which renders ordinary care on the part of the traveler an insufficient protection against injury and therefore makes the assumption of this burden on the part of the railroad company, of the employment of a flagman, a matter of common duty for the safety of others. It is no doubt true that only in a very extraordinary case could a railroad company be chargeable with negligence for failure to keep a flagman at a country crossing. But this was no ordinary country crossing. It was located very near to the city limits at a point where there was very considerable traffic on both the highway and railway; both roadway and railway were obscured by deep cuts and the weeds and rubbish on the banks; the track was quite crooked, winding its way through the hills and ravines in such manner as to greatly increase the hazard beyond that of a crossing in the open

country or in ordinary country conditions and surroundings. The exception to the instruction criticised must therefore be overruled.

Other exceptions which are taken to instructions upon the presumption of care by the deceased in the absence of eyewitnesses of the collision are governed by what we have already said upon this subject and need not be further considered. The cases of *Crawford v. R. R. Co.*, 109 Iowa 433, and *Thompson v. R. R. Co.*, 162 Iowa 468, to which our attention is called, hold no more than that such presumption will not be indulged where the evidence shows that the injured party could not have exercised due care, or where the eyewitnesses saw the person up to a point where it was impossible for him to escape injury. In the present case, we repeat, there is no eyewitness of the conduct of the deceased from the time when he was still about 75 feet distant from the crossing, leaving him wholly unobserved from that moment until he was found in his injured and unconscious condition. Here was ample time and distance in which to check the pace of his team and look and listen as best he could in the unfavorable surroundings, and who shall say he failed to do so? The mere fact that he might have avoided injury had he refrained from attempting the crossing will not justify a holding that he was guilty of contributory negligence. Such reasoning would render impossible a recovery for injuries in a crossing collision under any and all circumstances whatsoever, for in every instance the accident could have been avoided had the injured person not attempted the passage. So far as contributory negligence is concerned the sole inquiry is whether the person used the care and caution of a person of ordinary prudence for his own safety. If he did, then he was not negligent even though he was mistaken in his judgment as to the imminence of the peril.

Criticism is also directed against the court's instruction upon the measure of plaintiff's damages because of the alleged

vague and indefinite character of the evidence, which it is
contended does not justify the assessment of
substantial damages. The objection is not well
founded. The evidence on part of plaintiff
tends to show that deceased was about fifty
years old and left property to the amount of $1,300 and $2,500
in life insurance. It further appears that he was of indus-
trious habits. There is no evidence that he had been accus-
tomed to work for wages or any definite showing as to his
earning capacity. He had suffered some from rheumatism
but nothing to indicate that he was materially less capable
of earning money than the average man of his years and
experience. We think that upon the showing thus made the
jury could make a reasonable and fair estimate of the value
of his life to his estate and the question was not improperly
submitted by the court.

4. DEATH: dam-
ages: basis in
evidence to
estimate: suf-
ficiency.

IV. It appears that about the time or a few minutes after
the trainmen discovered the wreck on the crossing and stopped
to render aid, a witness living near by came on the scene and
he was permitted to testify in substance that
he heard the motorman say that they had on
a heavy load and could not stop the train, or
words to that effect. The admission of this
testimony is said to be erroneous because the matter so related
was hearsay, incompetent and not part of the *res gestae*.
Without going into any review of the many authorities cited
by counsel on both sides, we think the evidence comes well
within the established rule of this and many other courts and
the objection to its competency cannot be sustained. See
*Alsever v. R. R. Co.*, 115 Iowa 338; *Christopherson v. R. R.
Co.*, 135 Iowa 409; *Dubois v. Luthmers*, 147 Iowa 315; *Douda
v. R. R. Co.*, 141 Iowa 82; *O'Connor v. R. R. Co.* (Minn.), 6
N. W. 481; *Fish v. R. R. Co.*, 96 Iowa 702, 707.

5. EVIDENCE:
*res gestæ:*
test: instinc-
tiveness: co-
incidence in
time.

V. Among the errors assigned is one that the "court
erred in not withdrawing from the jury the first and second

paragraphs of plaintiff's amendment to the petition.'' The

6. APPEAL AND ERROR: error: omnibus assignment.

first paragraph referred to charges negligence of the defendant in failing to provide a watchman or gates or other safety devices at the crossing. The second paragraph alleges failure of the trainmen to use due care to prevent the collision after discovering the peril of deceased.

It will be observed that the assignment of error is omnibus or compound in form; that is, the failure to withdraw from the jury two separate paragraphs of the pleading is

7. APPEAL AND ERROR: allegation unsupported by evidence: refusal to strike.

made the subject of a single exception. It is a rule of long standing that such an exception will not be sustained if the ruling complained of is correct with respect to either of the several matters so objected to. We have already held that there was no error in submitting to the jury the question whether reasonable care required the defendant to maintain a watchman or other safety device or application at the crossing and this sufficiently disposes of the assignment under consideration. We may add, however, that while the allegation of negligent failure to stop the car after seeing the peril of the deceased was left in the petition and statement to the jury, no instruction was asked or given with reference thereto and we think it very evident from the course of the trial and the manner of the submission of the cause that no prejudice could have resulted to the defendants on account thereof.

No prejudicial error appearing the judgment below is— *Affirmed.*

LADD, C. J., EVANS and PRESTON, JJ., concur.