ANDREW HINNAH, Administrator, Appellee, v. WILLIAM D. SEABA et al., Appellees; EDWARD A. SEABA, Appellant.

**ACTIONS:** Joinder—Holding One and Discharging Another. Plaintiff
1  in a joint action against two defendants for a tort may be entitled to judgment against one, even though he fails as to the other.

**EVIDENCE:** Res Gestae—Lapse of Time. Statements relative to what
2  took place at an encounter, even though made in response to non-leading questions, are admissible as part of the *res gestae*, when made at a time and place and under such circumstances as to preclude the idea of sinister motives,—when they are such as to afford a reasonable or reliable explanation of the encounter. So held where something like an *hour* intervened between the occurrence and the statements in question.

**EVIDENCE:** Demonstrative Evidence—Attitude of Parties in Fight.
3  A witness may be permitted to demonstrate to the jury the exact position at a particular point of time of two parties to an encounter.

**TRIAL:** Misconduct of Counsel—First Offender. Counsel may not
4  initiate misconduct and then complain that the opposite counsel followed into the same field.

**HOMICIDE:** Excusable or Justifiable—Use of Terms. Instructions
5  relative to self-defense are not prejudicially erroneous because a great/bodily injury is spoken of as an "enormous" bodily injury.

**HOMICIDE:** Excusable or Justifiable—Nonduty to Retreat. Reversi-
6  ble error results from so instructing as to impose a duty to retreat at the time of an assault, when the record evidence conclusively demonstrates that at said time the defendant could not retreat.

*Appeal from Keokuk District Court.*—CHARLES A. DEWEY, Judge.

JUNE 23, 1922.

ACTION at law against W. D. Seaba and Edward A. Seaba, for the recovery of damages for the death of deceased, alleged to have been wrongfully caused by the defendants. Trial to a jury. At the close of plaintiff's testimony, defendants moved for a directed verdict. The motion was overruled as to defendant Edward A., and sustained as to defendant William D., on the ground that there was no evidence to show that William D. inflicted a wound on the person of deceased which contributed to the death, and that there was no liability as to him. The court instructed the jury that plaintiff's claim as to William D. was withdrawn, etc. The trial proceeded as against appellant, who renewed his motion at the close of all the testimony, which motion was overruled. The jury found against said defendant Edward A. in the sum of $5,000. His motions for new trial, in arrest of judgment, and for judgment notwithstanding, were overruled, and judgment entered. Said defendant appeals.— *Reversed*.

*Stockman & Baker* and *F. M. Beatty*, for appellant.

*J. H. Wyllie* and *Willcockson, Hamilton & Updegraff*, for appellee.

PRESTON, J.—The petition was filed February 24, 1919, and alleged, in substance, that deceased came to his death by a wound inflicted upon him by a knife or other sharp instrument in the hands of Edward A. Seaba, and by a blow over the head and shoulders by a blunt instrument then and there in the hands of William D. Seaba; that said wound was inflicted and said blow struck without reasonable justification, about September 5, 1918, on which day deceased died, as a result of said wounds. The defendants answered in general denial. On October 5, 1920, plaintiff filed his substituted petition, alleging substantially that, about September 5, 1918, defendants, with force, did maliciously, wrongfully, purposely, and without lawful excuse or justification, and they in concert, one with the other and together, did assault, beat, wound, stab, and cut said Walter Keck; that defendant William D. struck deceased with a club or other blunt and deadly instrument, over the shoulders and

head of deceased; that the other defendant did cut and stab deceased with a knife, or other sharp instrument; and that deceased, as a result of said beating and cutting inflicted by defendants, died, September 5, 1918. On October 8, 1920, defendants demurred to the substituted petition, on the grounds that it attempts to set up an alleged conspiracy and confederacy, and thereby it is sought to set up a new and different cause of action from that pleaded in the original petition; that said substituted petition, on its face, shows that the cause of action therein set forth arose more than two years prior to October 5, 1920, and is barred. There seems to have been no ruling on the demurrer. On October 11th, defendants filed answer to the substituted petition, denying generally, and stating that, as they were informed and believe, deceased died as the result of a wound in the abdomen, caused by an instrument a description of which is to defendants unknown; that, as to the way, form, and manner said wound was received, defendants have no knowledge. They aver that, at the time he received said wound, he was engaged in making a wrongful and malicious assault upon the person of defendant Edward A., and that whatever physical force was used by defendants, or either of them, was in lawful defense of the person of said Edward A. In Division 2, they plead that the plaintiff's alleged cause of action is barred by the statute of limitations. The trial commenced on October 14, 1920, and on the 15th, defendant William D. filed an additional answer as a separate division, and for himself alleged that the acts charged in the petition as being done by him were separate and distinct acts from the said alleged acts charged as being done by his codefendant Edward; that said acts charged as being committed by Edward were in no way connected with or related to the acts of the other; and that, therefore, there is, as to said defendant Edward, a misjoinder of parties and a misjoinder of actions. On the same day, said Edward filed an additional answer, and as a separate division, and alleged that the acts charged in the petition as being done and committed by him were separate and distinct from those charged as being done by his codefendant William; that the said acts charged as being done by him and those of his codefendant were in no way connected

or related; and that there is, as to him, a misjoinder of parties and misjoinder of actions. On the same day, plaintiff filed an amendment to his substituted petition, striking therefrom the word "maliciously," and the words "in concert, one with another, and together."

1. The sufficiency of the evidence is challenged by appellant. Though this question is not in the order presented in the arguments, we shall take it up first, that the other points raised may be better discussed and understood. Some of the facts are undisputed, but at other points, particularly as to the transaction itself, there is a sharp conflict. Each side claims that the other was the aggressor, and started the trouble. Appellant contends that he was acting in self-defense, and there is evidence tending to so show. The evidence was such that a finding by the jury either way would have had sufficient support. In quarrels such as that involved in this case, there is nearly always a decided conflict in the testimony of the witnesses upon either side, and as to just what was said and the positions of the parties at a particular instant. The present case is no exception. Some seven or eight witnesses testify for plaintiff in regard to it; also a doctor in regard to the injuries to deceased, and that they were the cause of his death; and the two defendants, a brother, and a nephew, testify for defendants in regard to the transaction; and a doctor testifies as to marks on appellant, Edward. Each of the witnesses to the transaction testifies at considerable length. An examination of the record in regard to the facts has been somewhat laborious. Numerous corrections have been made in an additional abstract by appellee, and this in turn is followed by a denial and corrections, with a certification of the transcript of nearly 400 pages, which has no index. In some instances, we have had to search the transcript at pages other than those cited. The purpose of counsel is, doubtless, to try to present the case as nearly as may be in the way in which the jury had it—the shadings given to the testimony of the different witnesses, as well as that can be done in type. The jury and the trial court saw and heard, with their own eyes and ears, the matters which counsel have attempted to present to us. Naturally, the expression of the eye, features, appearance,

tone of voice, etc., of the different witnesses, cannot be transferred to the printing. The brief statement of the facts in the arguments comprises 20 printed pages. Condensed, the case is substantially this: Defendant Edward is a farmer and stock shipper, about 50 years of age, weighing about 120 pounds. His codefendant was about 53 years of age. Deceased was a farm hand, 22 years of age, weighing about 165 pounds. The controversy began at the Rock Island depot, in Sigourney, on Main Street, about half a mile north of the public square. About half way between the square and the Rock Island depot, and a little east of Main Street, is the Milwaukee railway depot and stockyards, where the controversy culminated. This was between 11 and 12 o'clock in the forenoon. Deceased died about 6 o'clock in the afternoon of the same day. It is conceded that, on September 5th, appellant had cattle in such stockyards, and had a right to use the yards, and that deceased was not a shipper, and had no live stock in the yards at said time. On the day in question, there was a large gathering of people in Sigourney, and at the depot, the occasion being the entrainment of a large body of soldiers from Keokuk County. There was the usual excitement. Appellant went to the Rock Island depot, with many others, after he, as he claims, had looked after his cattle at the stockyards. Deceased, Walter Keck, his brother Frank, and plaintiff's witness Bruns, and many others, were there. It is not shown whether or not appellant and deceased had, prior to this time, had any difficulty. At the Rock Island depot, there were some words between deceased and appellant. Plaintiff's evidence tends to show that, at the Rock Island depot, while deceased was there, talking about the boys' going away, he made the remark, not to appellant, but to others, that these boys will not get across this year, and that the boys over there will have a hard time crossing the Hindenburg lines. Appellant testifies on cross-examination as to this:

"Q. He was talking to you? A. No, he was talking to others. ' Q. You simply butted in? A. I said, 'Yes, they will.' Q. Well, you butted in, didn't you? A. Yes. Q. And you took it upon yourself to call him a pro-German, didn't you?

A. I did not. Q. What did you say? A. I said, 'pro-German as hell.' ''

The tendency of plaintiff's evidence is to show that deceased said not to call him a pro-German; that he was no more pro-German than defendant. Appellant walked around, and said something to deceased, and deceased then said:

''Now you go away from here,—you don't know anything, and I don't know anything either.''

Appellant then said:

''You damned pro-German, all you ever did stick up for was for the damned Dutch; you ———— pro-German, why aren't you going with these boys?''

Deceased said:

''I am ready to go any time they will take me. I could not go with this bunch. I am going with the next bunch, and I don't need you to see me off either.''

Deceased had not claimed exemption: he was classified to go in about two weeks. Thereupon, appellant said, ''If one of you men will come with me, I will knock the son-of-a-b——— down right here.'' At this, a niece of appellant's said to him:

''Uncle Ed, aren't you ashamed of yourself? Why don't you go away and keep still? Aren't you ashamed to start a fuss here like that?''

Deceased was angered by defendant's statement. The train arrived about 11 o'clock,—one witness puts it 11:30,—and departed soon afterwards. There is evidence, though denied, that Ray Seaba, a nephew of appellant's, said, either to deceased or to his brother, that appellant ''called you a pro-German. He ought not to have done it. You ought to go over there and make him take it back, and if you want to know where Uncle Ed is, he is over at the Milwaukee stockyards.''

Some of the evidence is that deceased then said he would go over and ask him to take it back, to retract the epithet that deceased was a pro-German, etc.; and other evidence is that he would go over and make him take it back. This was at the creamery, a short distance south of the Rock Island depot. The deceased, his brother Frank, Bruns, and perhaps others, started

to go over to the stockyards. On the way up Main Street, deceased took off his coat and vest, and carried them on his arm. He had also removed his collar and tie. Plaintiff says this was because it was a very warm day. Appellant contends that it was in preparation for a contemplated fight at the stockyards. Arriving at the stock pens, they found appellant and one Herman in Pen No. 2, where appellant's cattle were. Deceased, his brother, and Bruns entered Pen No. 1. The pens are separated by a high board fence. The stockyards consist of a number of pens and sheds, with alleys dividing the pens. The pens are about 30x32 feet; the alleys 12 feet wide. Pen No. 1 is to the southwest. No. 2 is immediately north of and adjacent to No. 1. They have a roof over the west side, extending about 12 feet east, and about 14 feet high; gates from the pens to the alleys. One witness puts it that, when he saw deceased and appellant in Pen No. 2, deceased was close to the south side, and appellant about the center of the pen. This, as we understand it, was before the fight began. Ray, it seems, had gone on ahead, to tell his father, William D.,—and he did tell him,—that the Keck boys were coming. Defendant William, his brother Henry, and Ray, entered Pen No. 2, so that there were five men in No. 2 and three in No. 1. Deceased spoke first, and said to appellant, "I want you to take back that 'pro-German.'" Appellant said, "You go to hell;" or something of that kind. Deceased said, "Come over here." Appellant said, "I won't do it." This was repeated two or three times, and deceased said, "I will come over there." There were more harsh words on both sides, and deceased started over the fence, when appellant said, with an oath, "You climb over that fence and I will knock your brains out," and raised his cane and struck, or struck at, deceased, through the fence. Deceased then stepped back, and picked up a board, and climbed the fence into Pen No. 2, taking the board with him. Herman and Frank Keck called to deceased to put the board down, Frank saying to deceased that he was man enough for appellant without the board. Frank says deceased did put the board down, and Herman says he either put it down or stuck it in the fence. Appellant testified that, after deceased got into Pen No. 2, either Herman took the board or deceased

dropped it. After deceased got over the fence into Pen No. 2, he asked appellant two or three times to take back what he had said, and appellant refused. Appellant told deceased to get out of there, and deceased said he would if appellant would take back what he had said. Appellant said he would not do it. Then deceased hit him on the side of the face, as one witness puts it.

From the foregoing, it appears that just before, or when, the fight began,—and it is appellee's contention,— deceased was not armed, and had nothing but his naked fists, when he struck appellant. It is also contended by appellee that deceased did not, in all that was said, ever threaten to do more than give appellant a whipping with his fists. There is evidence that, after the board was dropped, two witnesses saw appellant slip his right hand in his pocket, just before deceased struck him, and that he still had his hand in his pocket when deceased struck, and appellant was advancing towards deceased with his right hand in his pocket. Appellant says that he had his pipe in his hand, and put it in his pocket. Before appellant got his hand out of his pocket, deceased struck him in the face. The doctor for appellant testifies that it loosened the cartilage in the nose, and made a small abrasion, but the skin was not broken. There was a scratch or mark on appellant's finger. When deceased struck appellant, appellant was knocked down, and some of the witnesses say deceased struck again. Another witness says he seemed to be trying to get hold of appellant's hands. According to plaintiff's testimony, while deceased was thus stooping over appellant, William D. Seaba came up with a board, and struck deceased over the head. Just then deceased raised himself up, and said, "Oh! Oh!" and as he left the pen, exclaimed, "I am stabbed!" Appellant got up, and saw Frank Keck still in the pen, and said:

"You three-fingered son-of-a-b———, get out of here, or I will get you next."

A witness for plaintiff says that, after William D. Seaba hit deceased with a board, deceased raised himself up from appellant, threw up both hands, and made a kind of long moan or groan, turned to the right, staggered to the fence, climbed

over into the alley, and started towards town for a doctor. Witness walked around, and when he got to where deceased was, probably 60 feet from the scale house, deceased was staggering; raised up his hands and dropped down. Witness went to deceased, who was pale and blue, and his breath was labored. Deceased was carried across to Morrow's lot, just across the street. Morrow's is from 40 to 60 yards south of the stockyards. This witness says that in the yard he raised deceased up and held his head, while someone called the doctor. He thinks deceased was unconscious from the time he went to him until Dr. Dulin came. Dr. Dulin came about 11:30; found deceased in Morrow's yard, gasping for breath; considered him dying; thought he would only breathe a few more times; gave him a hypodermic, and this caused him to recover, to some extent. At 12:10 o'clock, deceased could recognize voices, but said he couldn't see. He began to be conscious at that time.

"I asked him some questions. I began to question him about 12:10. Will not say it was all the effect of the medicine that revived him. I gave him one or two hypodermics,—I think three. The strychnine would whip up the heart, and the morphine would stimulate the nerves. He said that Bill Seaba struck him with a board, and Ed Seaba had stabbed him; that Ed Seaba stabbed him, and afterwards Bill Seaba struck him."

Dr. Dulin describes the wounds on deceased: a slight abrasion on one shoulder, and a stab wound in the lower left abdomen, about three inches from the middle of the body, and almost down to the groin, nearly transverse; penetrated through the abdomen wall to the intestines. The wound was about three fourths of an inch long. There was a great deal of hemorrhage,—not much at first; and later, there was a large hemorrhage internally. Cause of death was the internal hemorrhage, due to the stab wound.

We should have stated that witness Herman testifies that he saw a knife on the ground, right below where Ed and Walter were fighting; that deceased was the closest to the knife; that he did not pick it up,—never thought about it any more until he came up town; that he thought that whatever was the matter with deceased was because of Bill's lick, and didn't think of

the knife until he heard that Walter was stabbed; that he didn't see anyone pick up the knife. The four Seabas, Henry, Ray, Will, and Ed, were left in the pen after deceased went out. Defendant says he had no knife, and did not stab deceased. Appellant testifies in part:

"The first thing that I knew that Walter Keck was there, I heard him say: 'God damn you, Ed Seaba, you take back that, or I will beat you. Come out here.' I told him to go away, I wanted no trouble with him; that these pens were mine. 'My stock is in here, and this pen is mine.' I took my cane this way, and told him, 'You stay out of here.' He said, 'Come out here, or I will come in,' and he jumped back and grabbed a board. This is the board. There were nails; I noticed the nails in the board. He walked up to the fence and drew back as though he were going to throw the board through the fence, and Herman said to him, 'Why, Walter, this won't do;' and then he climbs on the fence and brought the board over with him. He had the board in his hand when he got into Pen No. 2, and Herman said, 'Why, Walter, this will never do.' Frank Keck said, 'Don't ask him to take it back; go to him.' Frank Keck was standing back of me, a little to the northeast, and all at once I was pushed forward, and the same time Walter hit me, and struck me over the right eye and over the nose. I was standing this way, and he struck me a blow right here, and I fell this way. I fell, and Walter grabbed me by this arm, and kept jerking that up. I tried to hold it down, so that he couldn't hit me in the face, and he hit me on the back of the head several times. With that, he was up and gone. After Walter Keck knocked me down, he had ahold of my arm right here, and was at my back; and that would be west, or perhaps a little southwest. When he had hold of my arm, he was hitting and pulling at my arm. I think he hit me three times after he had me down. After I was knocked down, I didn't see my brother Will. After Walter got off of me, I straightened up, and I had my watch in my shirt pocket. I had no coat on, and as I straightened up, my watch was hanging down, and I put that in my pocket with my left hand. I had my cane in my right hand, and Frank was standing there. I said to him, 'What are you doing here?'

and with that I came up and drew my cane back to hit him, and he started to run.''

We do not understand appellant to claim that deceased had the board in his hands at the time he was struck, or that deceased struck him with the board. Defendant William D. says:

''With that, Walter climbed the fence with this board; but when he got on the ground, Herman says, 'Why, boys, this won't do.' Then the board was laid down.''

We have gone more into detail than intended; but this, in a general way, is the case. Defendant's witnesses give a different version of the transaction, and as to what took place at the time of the fight. As said, there was a conflict, and at some points a sharp conflict in the testimony. Without going further into details, or setting out more of defendant's testimony, it is enough to say that clearly there was a question for the jury as to what was done, and as to whether appellant was acting in self-defense.

2. Appellant cites a number of authorities to the proposition that, where the evidence shows conclusively that the torts were separable and distinct, a joint action cannot be maintained; 
1. ACTIONS: joinder: holding one and discharging another. and that, where the alleged torts are separate, and two defendants are sued jointly, plaintiff is entitled to a joint judgment, or nothing. We think appellant erroneously assumes that, in the instant case, there were two separate torts. There might be force in appellant's contention if William D. Seaba had, a week before, at some other place, acting for himself, struck deceased with a board, and at another time and place, appellant, acting alone, had stabbed deceased with a knife. In the instant case, the striking by William and the stabbing by appellant were substantially at the same instant of time. The same evidence would be admissible as to the transaction itself, whether these defendants had been sued separately or jointly. What occurred at that time was a part of the transaction. It does not necessarily follow that William would not be liable because William struck deceased with a board, and appellant wounded him with a knife, which caused the death. If they were acting together, or there

was a conspiracy, both might be liable, although only one inflicted the fatal wound. No conspiracy is alleged. In a criminal case, all persons concerned in the commission of a public offense must be indicted and tried as principals. Ordinarily, where two persons are sued, charged with committing a tort,—an assault, for instance,—if the evidence shows that one is guilty, and the other not, one may be relieved from liability, either by the court or by the jury, and the other held. In the instant case, the defendants were sued together. The trial court was of opinion that the evidence was not sufficient to show that anything William did was the cause of the death, and directed a verdict in his favor. We are not so sure that the court was correct in so holding; but plaintiff has not appealed from that ruling, and indeed now concedes that there was not sufficient evidence to hold William. We do not pass upon the question as to whether the court erred in directing a verdict for William. It is true that, by the amendment to the petition, or rather, the substituted petition, plaintiff alleged that defendants maliciously, and in concert one with another and together, assaulted, beat, and stabbed deceased. Later, and doubtless out of caution, and to avoid the making of a claim by defendants that a new cause of action was set up in the substituted petition, plaintiff withdrew the allegations last mentioned. This left the allegations therein in regard to this matter substantially the same as in the original petition. This being so, no new cause of action was set up in the substituted petition. Whatever new matter there may be in the substituted or amended petition does not state a new cause of action. It may amplify, to some extent, the charge made in the original petition, but whatever additions were contained therein were germane to the original allegations.

This disposes of the two errors assigned in regard to misjoinder and the statute of limitations. The court did not err in the different holdings and rulings in regard to these matters. We shall not stop to review the numerous cases cited. As supporting our conclusion in regard to the alleged misjoinder, see *Overstreet v. New Nonpareil Co.*, 184 Iowa 485, 492; *Boswell & Tobin v. Gates*, 56 Iowa 143. As to the alleged new cause of action and the statute of limitations, the following, among other

cases, may be cited: *Gordon v. Chicago, R. I. & P. R. Co.*, 129 Iowa 747, 750; *James v. Winifred Coal Co.*, 184 Iowa 619, 628.

3. Complaint is made that the court admitted evidence of Dr. Dulin and another, as to statements made by deceased that appellant stabbed him. The evidence was not admitted as dying declarations, and appellee does not so claim. It

2. EVIDENCE: *res gestae*: lapse of time.

is thought by appellant that, because the statements were made after the injury, and away from the place, and were prompted by questions put to deceased, the statements were the result of subsequent reasoning, and were not spontaneous statements; also, that they were made while deceased was under the influence of drugs. From the doctor's testimony, it would seem that the effect of the drugs was not to stupefy, but to revive. The entire transaction, from the time they left the Rock Island until the statements were made, must have occupied less than an hour. One witness states that the altercation took place between 11:30 and 12 o'clock. It is true that these statements were made after the fight was over, but it was soon after, and near the place of the tragedy. Deceased had just passed through an exciting fight, staggered to the Morrow yard, collapsed, and was in a dying condition, which doubtless deceased realized. He was breathing heavily, and had been unconscious. The tendency of the courts has been to relax somewhat the old rule that the relation of a past event, no matter how closely it may be related to the transaction itself and other circumstances, is inadmissible. In the instant case, the statements were made at such a time and place, and under such circumstances, as to preclude the idea that the statements were made with sinister motives and with deliberate design. They were such as to afford a reasonable or reliable explanation of the principal transaction. Within the rule of the cases, applied with care, the admissibility of such statements, under the circumstances of a particular case, is largely within the discretion of the trial judge. The following, some of which are civil cases, among many others which might be cited, sustain our conclusions: *Christopherson v. Chicago, M. & St. P. R. Co.*, 135 Iowa 409, 415, 417; *State v. Blydenburg*, 135 Iowa 264, 275, 276; *Insurance Co. v. Mosley*, 75 U. S. 397; *Keyes v. City of*

*Cedar Rapids,* 107 Iowa 509; *McMurrin v. Rigby,* 80 Iowa 322; *State v. Alton,* 105 Minn. 410 (117 N. W. 617). This last named case was where the statements were made some little time afterwards, and at another place, and after unconsciousness. See, also, *Kenney v. State,* 65 L. R. A. 316, and note; *Bettinger v. Loring,* 168 Iowa 103, 117; *Stukas v. Warfield-Pratt-Howell Co.,* 188 Iowa 878, 888. In the *Christopherson* case, supra, the statements were made about three quarters of an hour after deceased was found in an unconscious condition. And in the same case, at page 418, it was held that the fact that a portion of the declaration was in response to a question by the physician is not significant, since the question was not leading or suggestive. In the instant case, it does not appear that the questions asked by Dr. Dulin were so. There was no error in admitting this testimony.

4.. Appellant complains that Mr. Wyllie, plaintiff's counsel, during the examination of Frank Keck, who was an eyewitness to the fray, was guilty of prejudicial misconduct, in

3. EVIDENCE: demonstrative evidence: attitude of parties in fight.

that he asked witness to show the jury the position appellant was in when, as witness said, appellant had his right hand in his pocket when deceased struck him; also to show the position deceased took with reference to appellant. The objection is that the experiment was not competent, for the reason that there was no substantial or approximate identity of the conditions shown. Appellant cites 5 Encyc. of Evidence 484, 485. As said, the witness had been an eyewitness to the transaction, and was showing, according to his memory or theory, the positions. We see no impropriety in the procedure thus far. Whether the conditions were substantially the same was a matter for the determination of the trial court. *Chicago Tel. Sup. Co. v. Marne & E. Tel. Co.,* 134 Iowa 252, 259; *Boerner Fry Co. v. Mucci,* 158 Iowa 315, 321. See, also, 8 A. L. R. 18, and note, and Abbott's Civil Jury Trials 407, where many cases are cited in regard to experiments before the jury. We assume that the real objection at this point is that, when witness was asked to show the position deceased took with reference to Ed Seaba, defendants made the following objection:

"Incompetent, and defendants further object to the attorney making the motion as if he were stabbing someone, as immaterial, irrelevant, and prejudicial.

"Court: Sustained, if the attorney made any motion of that kind. That would be absolutely wrong, and gentlemen of the jury, you will not give any consideration, if he did anything. (Plaintiff excepts.)"

There was no exception by defendants. Furthermore, it does not appear that plaintiff's attorney did make such a motion. The only record is that plaintiff included that statement in the objection. Evidently the court did not see it. The court admonished the jury not to consider it, if it did occur. We think there was no error here.

5. Appellant's next complaint is that there was misconduct on the part of Judge Willcockson, of counsel for plaintiff, in reading the pleadings to the jury. The evidence does not show that the pleadings were so read. It is also complained that Judge Willcockson offended by referring to the trial of appellant on a criminal charge, growing out of this transaction. There is too much of the record to set it out. It does appear, however, that two of defendant's counsel first referred to that matter, and stated that appellant was tried for murder in this court before a jury of twelve men, and that the record shows that since that trial he has been at home, and has been at home ever since. The purpose plainly was to get before the jury the statement or inference that appellant had been tried and acquitted. Counsel for plaintiff strenuously objected to this, and a controversy arose between counsel, in which the court took a hand, and stated to both that they should not go out of the record; that the other case had nothing to do with this; and that the court would instruct the jury in writing not to consider it. It is manifest that whatever counsel for appellee may have said in this regard was in response to and as a part of the discussion on this subject, first brought out by counsel for appellant. Under such circumstances, appellant may not complain.

6. Nineteen instructions were given by the court, eight of which are complained of, and are thought by appellant to be

*4. Trial: misconduct of counsel: first offender.*

erroneous. As to some of these, the objections do not warrant special mention. To illustrate, one of the objections to Instruction No. 6 is that it told the jury, in effect, that, when one is assaulted, and the character thereof does not involve life, or great bodily injury, the person assaulted, if he does not choose to stand and submit to battery, must retreat, if any way is open to him. We do not find that No. 6 refers in any way to the question of retreat. That question is, however, in another instruction. Another objection to No. 6 is that it changes the burden of proof, and is in conflict with No. 3. We do not think the objection is well taken.

Again, the court properly defined a great bodily injury, and instructed as to the right of defendant to defend himself, if necessary, to preserve his life or prevent great bodily injury, 5. HOMICIDE: ex- etc. In some of the instructions, the court uses cusable or justi- the word "grievous" and the word "enormous" fiable: use of terms. bodily injury. Such is the language used in some of the cases. The complaint is that the court should not have used the words "grievous" or "enormous," unless they were defined. Appellant cites 3 Words & Phrases 2399, and 4 Words & Phrases 3162, to show that the words do not mean the same. It is doubtless true that the instructions would have been plainer to the comprehension of the jury, had the words "great bodily injury" been used, instead of the others; but we think the jury could not have been misled. *State v. Murdy*, 81 Iowa 603, 613, sustains appellee's contention.

Another instance: The court defined the expression "a dangerous and deadly weapon." It is appellant's thought that this was erroneous, in that it limits such a weapon to mean an instrument or means other than the fists; and that, in the instant case, defendant, as he claims, was assaulted by deceased with a board and with his fists; and that the actual battery was inflicted with the fists; that the jury might conclude that the fists might not be used as dangerous and deadly weapons. The instruction could, of course, refer to the knife, as well, if it was used. The instructions nowhere say that the fists might not, under some circumstances, be considered dangerous. In other instructions, the jury was told that it was proper to take into

consideration all the facts and circumstances in the case, as bearing upon the question whether defendant reasonably, and as a reasonable man, etc., to his apprehension was in danger of death or great bodily injury. We shall not stop to consider all the other instructions.

There is trouble, however, at one point. Instruction No. 11, on the question of the duty of defendant to retreat, cannot, under the evidence in this case, be sustained. , The court instructed, in substance, that mere words would not justify an assault. This would apply to both deceased and defendant. The court also instructed, and properly so, that, under the undisputed evidence, deceased first assaulted the appellant. The court also instructed that a man may repel force by force, in defense of his person, against unlawful attack, etc., and further that, when a person assaults another, the person assaulted has the right to use sufficient force to resist such an assault, and to compel the person assaulting to desist therefrom, etc. It may be that deceased, as well as appellant, had a right in the stockyards of the railroad company, although deceased had no stock there, and had no business there other than to secure a retraction from appellant, or give him a beating. In any event, the assault by deceased was unlawful. Clearly, appellant had a right in the stockyards, and to be where he was when assaulted by deceased. When deceased advanced towards appellant, and assaulted him with the board, or if he dropped the board and continued to advance towards appellant and assaulted appellant with his fists, and knocked him down, what was appellant to do? Should he have turned tail and run, and subjected himself to the jeers and ridicule of the bystanders, etc.? This, we suppose, is one of the things referred to in some of the cases where the frailties of human nature are referred to, and it is said that the doctrine of retreat is not, under all circumstances, adapted to American conditions. As said in the last of our cases on the subject, *State v. Borwick,* infra, the doctrine of retreat is still a part of the law of the land, in a proper case, but it has been appreciably alleviated in later years. The *Borwick* case was not published until after, or about the time of, the submission of this case.

6. HOMICIDE: excusable or justifiable: nonduty to retreat.

In the instant case, appellant had the right to stand his ground, and meet force with force. The jury was so told. In the instant case, the deceased almost instantly, after advancing toward appellant, struck appellant and knocked him down. He was down, or partly down at least, from that time on until deceased withdrew, and said he was stabbed. It appears that deceased was holding appellant's hands. We suppose appellee seeks to draw the inference that this was done to prevent appellant from using the knife. Appellant himself says that deceased was holding his hands, and that deceased struck him again two or three times. The question arises, When, under the evidence, did appellant, in standing his ground, after he was assaulted, have an opportunity to retreat? Conceding that, under some circumstances, a defendant might be confronted with the alternative of taking the life of his assailant or retreating, it seems to us that, under the undisputed evidence, appellant had no opportunity to retreat. His back was already to the wall. A part of Instruction No. 11, after stating that the party assaulted is not bound to draw nice calculations from appearances, etc., reads:

"But before one is justified in taking life in self-defense, it must be, or it must reasonably appear to be, the only means of saving one's own life, or prevent great bodily injury. If it is evident to the assaulted that the danger which appears to be imminent can be avoided in any other way, as by retiring from the conflict, the taking of the life of the assailant is not excusable. And if you find in the evidence of this case that, *at the time the said Walter Keck assaulted* the defendant Edward A. Seaba, the said Edward, from the character of the *assault,* had reason, as an ordinarily prudent and courageous man, to believe, and did in good faith and honestly believe, that he was in danger of being killed, or suffer great bodily injury, and that the parties were so situated that he could not have retreated, or that he could not reasonably have expected to have preserved his life or protect himself from injury by retreating, then, in that case, the said Edward was justified in using such force and such means to protect his life and person as may, in good faith, have then appeared necessary to him," etc.

We think the jury may have been misled, and were likely to be misled, into thinking that it was the duty of appellant, "at the time the said Walter Keck assaulted defendant," to retreat. This is in conflict with the prior instruction that, at the time appellant was assaulted, he had a right to stand his ground, and meet force with force. Furthermore, this instruction was erroneous if, as we hold, under the undisputed evidence, there was no opportunity to retreat, when and if it became necessary, if at all, for appellant to determine whether he should retreat or take life, if necessary to protect himself. Appellee meets this proposition in argument by saying that Instruction No. 11 has been the law of this state ever since the case of *State v. Thompson*, 9 Iowa 188, and that it is cited and approved in *State v. Thomas*, 151 Iowa 572, 578, and *Moran v. Martinson*, 164 Iowa 712, 717, where the court says that the defendant was "permitted to use such force, and no more, as to him then appeared reasonably necessary, to protect himself from imminent injury."

The quotation has nothing to do with the question of retreat. We do not find that the doctrine of retreat was discussed in the *Moran* case. We have seen that the old rule in regard to this has been modified, not only in this state, but quite generally. We think this case is ruled by *State v. Borwick*, 193 Iowa 639. See, also, *State v. Gough*, 187 Iowa 363, 367, 368; *State v. Evenson*, 122 Iowa 88; *State v. Dyer*, 147 Iowa 217, 221; and other cases cited in the *Gough* case.

Under the undisputed evidence, the giving of this instruction, or the part of it discussed, in this form, was error, and prejudicial to the appellant. Because of it, the cause must be reversed. Whether, under all the evidence, appellant was justified and excused, on the ground of self-defense, was for the jury.

The word "absolutely," in Instruction No. 9, is complained of. A part of that instruction is:

"But if the defendant Edward A. Seaba was not reduced to such apparent extremities or danger as reasonably appeared to him to render it absolutely necessary to use a dangerous and deadly weapon," etc.

It would have been better to have omitted the word "absolutely."

Other instructions and numerous other questions are raised and argued, but they are not such as are likely to occur on a retrial, and we shall not prolong the opinion to discuss them in detail.   The cause is—*Reversed and remanded.*

WEAVER and DE GRAFF, JJ., concur.

STEVENS, C. J., concurs in the result, but not with the discussion as to *res gestae.*