STATE v. THOMAS ALTON.[1]

September 4, 1908.

Nos. 15,644—(26).

**Evidence—Res Gestæ.**

The prosecutrix was criminally assaulted while wheeling her child in a baby carriage in a somewhat secluded spot. She was choked into insensibility, and, upon regaining consciousness, found the child and its carriage missing. In the course of half an hour she approached a house, about half a mile distant, in a greatly exhausted and excited condition, crying and screaming, and to the person who came to her assistance she made statements to the effect that some one had knocked her down and stolen her baby; that some one had killed her baby. "A man tried to kill me and my baby," and she repeatedly called upon the people present to find it. She was bleeding from wounds in the face. The child was found and returned to her, after which she was taken into the house.

*Held*, all such declarations as were made up to the time her child was found and restored to her were properly admissible in evidence as a part of the res gestæ; but it was error to receive in evidence the statements and declarations which were subsequently made by her after she entered the house, which were not made in the presence of the defendant.

**Same—Remoteness.**

The single fact that a stain upon defendant's shirt sleeve was blood, it not being shown to be human blood, and it appearing that it may have been deposited there for six months or a year, was too remote and of no probative force in establishing the identity of defendant as the guilty party.

**Incompetent Evidence.**

The determination by microscopical test that a stain on defendant's shirt contained spermatozoids, in the absence of any other evidence tending to prove their origin and time of deposit, was incompetent for the purpose of identifying defendant.

**Same.**

The fact that a small pearl button taken from the ground at the place of attack contained a shred of black cotton cloth of the same texture as defendant's shirt, together with the fact that a button was missing from one sleeve of defendant's shirt, was, under all the circumstances of this case, incompetent evidence, not tending to establish the identity of defendant.

[1] Reported in 117 N. W. 617.

Defendant was convicted in the district court for Hennepin county of the crime of rape. From an order, John Day Smith, J., denying a motion for a new trial, defendant appealed. Reversed.

*Thomas Kneeland* and *Thos. D. Schall,* for appellant.

*Edward T. Young,* Attorney General, *Charles S. Jelley,* Assistant Attorney General, and *Al. J. Smith,* County Attorney, for the state.

LEWIS, J.

Defendant was convicted of the crime of rape alleged to have been committed at Medicine Lake, Hennepin county, August 2, 1907. Beyond any doubt whatever, the prosecutrix was most cruelly assaulted, and the evidence is sufficient to sustain the charge of rape; but it is by no means conclusive that defendant is the guilty party, and our review of the case will be confined to the assignments of error which are directed to the evidence and rulings of the court with respect to the defendant's identity.

On the northwesterly shore of Medicine Lake, during the summer of 1907, stood a hotel and saloon kept by John Krumholz. A public highway ran past this place in a southerly direction along the westerly side of the lake. On the westerly side of the highway, and about three hundred sixty feet south from the hotel, stood a house then occupied by Mathias Mengelkoch and his wife, Elizabeth Mengelkoch, the prosecutrix. At a point about one hundred eighty feet south from the hotel another road branched off, running westerly for a distance of about three hundred seventy five feet, and then in a southwesterly direction, passing in the rear of the Mengelkoch house, about one hundred eighty feet distant therefrom. This road was not generally used by the public, but led to certain hay meadows and small fields located within a mile from the Krumholz hotel. A path ran from this road easterly to the Mengelkoch house. At a point about two hundred feet south from this path, the road divided, one branch running northwesterly, perhaps three hundred feet to the Winn house, and the other branch continuing in a southerly direction for about one hundred fifty feet, where it again divided, one branch leading southerly to an open field, cottage, and hay meadow, the other branch leading on to the south. At this junction was located a pile of cordwood. The "berry patch" was at the side of the south branch of the road, and

perhaps two hundred feet south of the junction and south of the cord-wood. The country around was generally wooded, with the exception of certain small clearings and hay meadows.

On the afternoon of August 2, 1907, according to her testimony, Mrs. Mengelkoch left her house, and, wheeling her baby carriage, passed by way of the path to the private road in the rear of her house, and then down the road to the berry patch. After picking berries about an hour, she started back, and just as she passed the junction she noticed a man step from the brush into the other road, not over a rod or two distant from her. She testified: That she recognized him as the same man she had seen upon two former occasions and described his dress. He had on a black shirt and "pants," and light hat. That she passed on, wheeling the carriage, and turned out of the road to allow him to pass. That he came on, walking fast, and, when he was within two feet of her, she turned and caught a glimpse of his features. That he grabbed her around the neck, and choked her into insensibility. Upon regaining consciousness, she found herself bleeding from wounds on the face, and, being at first unable to walk, she crawled along the ground towards her house, looking for the baby carriage, which was missing. She went back to her house only to find no one around, and passed on towards the Krumholz hotel. A short distance from the hotel she met a stranger. "He asked me what had happened and I told him all about it. Then later on, when Mr. Krumholz came, he asked me what had happened, and I told him about it. He asked me whether it was the barber, and I told him, 'No.' He asked me whether it was Mr. Winn, and I told him, 'No.' And then he says, 'Do you know the man?' and I says, 'No.' He says, 'Would you know him if you seen him?' and I told him, 'Yes; it is the man that has been working for you, and I saw him several times before this week. He went through this road several times.' He asked me how he was dressed and I told him he wore a black shirt, black trousers, and a light hat. He asked me whether he was an old man, and I told him 'No.' He was a young man, smooth faced. Q. Did you know this man's name? A. No; I didn't. Q. Did you know then that he worked for Krumholz? A. No; I took it for granted that he did. Q. You took it for granted that he did? A. Yes, because he was walking along with the pitchfork there."

The witness further testified that after the baby was found, and she was resting in the hotel, the defendant was brought in before her, and that she recognized him as the man who assaulted her. On cross-examination the witness stated that in trying to defend herself she knew she touched his face and neck with her hands and finger nails. "I thought so as far as I could tell." She also claimed to have seen defendant walking in the public road near the bridge on the Tuesday previous to the assault (Friday). On that occasion he was carrying a pitchfork, came from the direction of the Krumholz house, and passed down the private road. He then had on a black shirt. He was a rod or two distant from her. She also testified that on the Wednesday or Thursday previous to the assault she saw the man from her garden as he passed down the private road about six rods away. At the trial the witness insisted that the defendant was the man who assaulted her.

In addition to the testimony of the prosecutrix, the state produced the testimony of several persons who testified to certain statements made by the prosecutrix when she was first discovered approaching the hotel which were all admitted as part of the res gestæ over defendant's objection. Guy Hastings, who was stopping at the hotel, testified: That from the hotel kitchen he observed the prosecutrix coming up the road near the bridge and went out to meet her. That she was staggering, could hardly walk. The left side of her face was battered up. "One of her eyes was nearly closed—the left one, I think it was—and blood was running out of the corner of the other eye. The first words she said that I could understand after she got up near the house was: 'My baby! My baby!' She kept saying that, and wanted somebody to help find her baby. She said: 'Somebody has killed my baby. My baby! My baby! Won't you help me to get my baby?'" That she was crying, and that he asked her what the trouble was, and that she said some one had come up behind her and knocked her down and stolen her baby. "I asked her if she had any idea who done it, and she said: 'Yes; the man that worked for John Krumholz.'" Several witnesses testified to her condition and appearance. All agreed that she was cut and bruised about the face, which was swollen and bleeding; that she was greatly exhausted and excited, and constantly called for her baby, claiming some one had killed it.

The baby was found sleeping in its carriage behind the woodpile near the scene of the assault.

While outside the hotel and after the baby had been found, she stated to Mr. Krumholz, so he testified, that the man wore a black shirt and trousers, and that she had seen him coming two or three times that week over that way; "that she thought I knew the man; that he worked for me." Mrs. Hastings testified that she was present with the others when the prosecutrix first came towards the hotel; that she cried out in her hearing, "The man, the man!" and, when asked if it was her husband, she replied, "No, no!" that it was a strange man with a black shirt, dark pants, and a light hat, and that she had seen him two or three times by her place.

After the baby had been found, the woman was taken into the hotel; and, while waiting there, Mr. Krumholz went down to the meadow and found defendant at work putting up hay at a point about four hundred feet southwesterly from the road junction near the woodpile, and, according to Mr. Krumholz's testimony, the following conversation took place: "When I reached him I asked Tom if he heard anybody around there, any stranger, or anybody, and he says, 'No'; and then I asked him if he heard anything, any voice or any woman holler, and he said, 'No; all I heard around here was the chickens cackling.' And I told him that my neighbor's wife had been almost killed, and he says: 'Is that so? That's too bad. I will be over there in a little while.' That was all I said to him. I did not tell him that he was suspected."

Mr. Krumholz then went back, and shortly thereafter defendant, having finished his work in the meadow, went to the hotel and was told to go in, that they wanted to see him. He presented himself to the prosecutrix, and was dressed in a black cotton shirt with the sleeves rolled up and in dark trousers. He was a young man twenty one years old, with a smooth face. The witnesses differ somewhat as to what was said at that time; but three of them testified that, upon seeing him, the prosecutrix said: "As sure as there is a God in Heaven, that's the man." Mr. Krumholz testified that he heard defendant answer: "There's thousands of men in this world, and you want to be sure." Mrs. McKay thought he answered by saying that she was mistaken. Mrs. Wambolt thought his answer was that she had better get the

right man. Mr. McKay testified that the defendant answered by saying: "Well, lady, you are making a very grave mistake; there is hundreds of men in this world wears black shirts."

1. The first declarations of the prosecutrix before her baby was found were made from twenty to thirty minutes after she regained consciousness, and at a place more than a quarter of a mile distant from the place of assault. Her later statements to Mr. Krumholz, after her child had been restored, were made probably twenty to thirty minutes later, but at about the same place, and the same statement as to his dress, according to Mrs. McKay's testimony, was made several minutes later and after the prosecutrix and several other people had entered the hotel. The admissibility of the evidence concerning these various statements and declarations is the question presented, and we must admit that our conclusions have been reached with some hesitation.

The books contain thousands of cases upon the subject, and the text-writers and reviewers have endeavored in vain to deduce from the decisions any rules or principles from which it may be determined with any degree of certainty, where the statements and declarations of this or similar character may be considered as coming within the res gestæ. Wharton, Crim. Ev. § 262, proclaims the following as a general principle: "Res gestæ are events speaking for themselves through the instinctive words and acts of participants, not the words and acts of participants when narrating the events. What is done or said by participants, under the immediate spur of a transaction, becomes thus part of the transaction, because it is then the transaction that thus speaks. * * * The question is: Is the evidence offered that of the event speaking through participants, or that of observers speaking about the event?" The author further states that there are no limits of time within which the res gestæ can be arbitrarily confined; that they vary, in fact, with each particular case.

In a leading case upon this subject—Insurance Co. v. Mosley, 8 Wall. 397, 19 L. Ed. 437—where the deceased had made a statement as to the cause of his injury, Mr. Justice Swayne cited with approval Com. v. M'Pike, 3 Cush. (Mass.) 181, 50 Am. Dec. 727 (discredited by Wharton, Crim. Ev. § 262), and, after referring to other cases, said: "Here the principal fact is the bodily injury. The res gestæ

are the statements of the cause made by the assured almost contemporaneously with its occurrence, and those relating to the consequences made while the latter subsisted and were in progress. * * * The res gestæ are the declarations tending to show the reality of its existence, and its extent and character. The tendency of recent adjudications is to extend rather than to narrow, the scope of the doctrine. Rightly guarded in its practical application, there is no principle in the law * * * more safe in its results. There is none which rests on a more solid basis of reason and authority. We think it was properly applied in the court below. In the ordinary concerns of life no one would doubt the truth of these declarations, or hesitate to regard them, uncontradicted, as conclusive. Their probative force would not be questioned. Unlike much other evidence, equally cogent for all the purposes of moral conviction, they have the sanction of law as well as of reason."

This subject was under consideration by this court in O'Connor v. Chicago, M. & St. P. Ry. Co., 27 Minn. 166, 6 N. W. 481, 38 Am. 288. In speaking for the court, Chief Justice Gilfillan had before him Insurance Co. v. Mosley, supra, and Lund v. Inhabitants, 9 Cush. (Mass.) 36, leading cases, tending to extend the doctrine, and also many cases rather tending to restrict it, and the court approved of the statement that "the res gestæ mean those declarations and those surrounding facts and circumstances which grow out of the main transaction," and applied it to a case where the declaration was made some time after the accident and while the men were engaged in making repairs. In State v. Horan, 32 Minn. 394, 20 N. W. 905, 50 Am. 583, the court considered the victim's description of the robbers as a part of the res gestæ, although his statement was made after he had called up the policemen by 'phone, and they had met him at his own house. See also Hyvonen v. Hector Iron Co., 103 Minn. 331, 333, 115 N. W. 167.

Whatever may be said with respect to the position taken by other courts, we are strongly impressed with the view that the rule should be liberally applied, at least in cases of accident or personal injury, when the party is suffering from bodily pain or mental anguish. Neither the length of time intervening nor the place of the declaration are necessarily controlling. If under all the circumstances of a given

case it can reasonably be said that the declaration is probably true, it may be submitted for the consideration of the jury with proper instructions.

We are satisfied that the statements made by the prosecutrix up to the time her child was restored to her were properly received in evidence. Although she had been brutally assaulted, yet insensible to her own physical suffering, and nearly crazed with the thought of injury to, or destruction of, her child, the exhausted woman crawled and staggered to the nearest place where relief might be found, and then at the first sight of friendly faces the anguish of her soul found expression, and she begged them to find her child. Can it be doubted by any reasonable person that her description of the man's dress and general appearance was but the natural and spontaneous reproduction of the picture which a few moments previously had been impressed upon her memory? She was in no state of mind to reflect and consider and plan a false story, and her condition and manner of expression were not consistent with the attitude of one who was telling the story of a past event. The call for help and the endeavor to direct attention to the "man" were as much a part of the transaction itself as though uttered at the very instant of attack. They were produced by and grew out of the assault, would not have been otherwise uttered, and hence must be considered as part of the res gestæ.

But the discussion reaches a doubtful point when we come to those declarations which were made after the mother and child had been united, and sufficient time had passed to permit her to become calm and to deliberate upon what had taken place. She had gone into the house, and for half an hour had been resting and talking with the women present. The strain had been relieved; the reaction had come; there was time for reflection and a comparison of events. She was more or less subject to the opinions and suggestions of those around her, and there was lacking that involuntary, spontaneous manner which before had characterized her expressions. We are convinced that a relaxation of the rule to include the later declarations would be unwarranted and fraught with danger. They should have been excluded, and it was error to receive in evidence the testimony with reference to the statements and declarations of the prosecutrix which

105 M.—27

were not made in the presence of the defendant and which were no a part of the res gestæ.

2. In addition to the evidence above discussed, the state attempte to identify the defendant as the guilty man by proof of three inde pendent facts: The presence of a blood stain upon one sleeve of hi shirt; evidence of seminal discharge as appeared from certain othe stains upon the shirt; and the fact that a small pearl button was foun upon the ground where the assault took place, coupled with the fac that a button was missing from one of the sleeves of defendant's shir

Mr. A. D. Meeds, chemist for the health department of the city o Minneapolis, was called as a witness on behalf of the state, who tes tified that he had been furnished with defendant's shirt, and that smear of dried blood from one-eighth to one-fourth of an inch i width and about three-fourths of an inch in length was found upo one of the sleeves; that he had subjected the same to the Guaiacur and Teichmann chemical tests; and that as a result of his examinatio he was of opinion that the stain was blood. On cross-examination th witness stated that he could not express an opinion as to how lon the blood had been on the shirt, whether for a month, three month or a year, and he did not pretend to know that it was human bloo Upon the conclusion of his testimony counsel for defendant move to strike it out upon the ground that it was irrelevant, immaterial, an incompetent.

We have taken occasion to examine many of the authorities referre to in the text-books and treatises on the subject of blood stains, an while in many cases it has been held competent to receive evidence the fact that certain stains upon garments or implements were in fa blood without being required to determine whether it was huma blood, in all those cases the facts were peculiar to each case and t spots were generally of recent origin, and there was little question to the identity of the party committing the crime. For instance, Green v. State, 97 Tenn. 50, 36 S. W. 700, Green was charged wi murder, and as one incident it was shown that he was the owner of pair of buckskin gloves which soon after the murder were found a toolbox on his premises with every indication of having been stain with blood. It was shown that he was accustomed to wear the glov that he had them on his hands a day or two preceding the murder, a

was without them the day immediately after, and one of the gloves presented the appearance of having been scraped on the inside of the palm. The chemical analysis showed it was blood, but it was impossible to determine whether or not it was human blood. The court held that it was competent for the consideration of the jury in connection with the other facts and circumstances.

In People v. Loui Tung, 90 Cal. 377, 27 Pac. 295, the defendant was convicted of the crime of robbery, and it was conceded at the trial that there was blood upon his coat, and it was held competent for a witness to testify that shortly after the robbery he saw defendant, and that there was fresh blood on his coat at that time. Also in Com. v. Sturtivant, 117 Mass. 122, 19 Am. 401, it was held proper to show that a coat of the defendant contained blood stains, and that it had been examined by experts when it was fresh, and from the indications the spots were deposited upon the clothing from some point below.

In the case before us, although the chemist stated that the smear one-eighth of an inch wide and three-fourths of an inch long, found on the shirt sleeve, was blood, that it might have been there for the period of one year and might have been the blood of some animal or fish, yet the jury were permitted to infer that it was received by the defendant coming in contact with the blood of the prosecutrix at the time of the assault.

According to the recent writers on medical jurisprudence, the method of testing blood stains has advanced gradually under the careful analysis of scientific men, and it is now claimed that under favorable conditions it is possible to detect human blood from the blood of other mammals by the application of three different methods: The use of the microscope; the spectroscope; and by the serum test. The subject is fully treated in Reese's Edition of Taylor, by Hamilton, Witlaus & Hecker, and more recently by W. D. Southerland. The reader of these works will not fail to be impressed with the marvelous precaution with which such tests must be conducted in order to obtain trustworthy results. Whereas formerly the Guaiacum test was accepted as a sure method of determining blood, recent experiments have shown its unreliability and that method has now been abandoned by many experimenters.

Conceding, however, that the expert called by the state was correct in his analysis, and that the stain upon defendant's shirt sleeve was blood, of what probative force was it in this case? The state was required to prove beyond a reasonable doubt, not only that the crime alleged was committed, but also that the defendant committed it. The blood stain was not shown to be of recent origin. It may have existed for weeks or months, and the only evidence that it was human blood is the inference drawn from the assumption that defendant came in contact with the bleeding wounds of the prosecutrix. To avoid pure conjecture, the state was required to establish facts which would warrant the conclusion contended for. So far as the record shows, it may have been a spatter of blood from a fish received while defendant was cleaning the boats, or from one of many sources other than the one designed to impress upon the jury, and it was error to submit the evidence upon that subject for their consideration.

3. What has been written with reference to the blood stain applies with equal force to a stain claimed to have been caused by seminal fluid. The test shows the presence of "two spermatozoa," but to justify the inference that they came from the defendant while attempting carnal connection with the prosecutrix required additional evidence reasonably tending to prove that it originated upon that occasion. The expert testified that it could not be determined whether it was of recent date, and its origin was purely problematical. The court should have excluded this evidence as being too remote.

4. An expert testified that he made a microscopical examination of the shred of cloth remaining in the small pearl button found upon the ground where the assault took place, and that it was of the same texture as the cloth composing defendant's black cotton shirt. The comparison was based on the fact that the threads in both consisted of minute nodules or bunches located at the same intervals. A button was missing upon one of the sleeves, but the button upon the other was of a different kind. It was not shown that the shirt or clothing of the defendant contained any other button of the same kind as the one found. Defendant's mother and sister both testified that the shirt belonged to defendant's brother, had been worn by him, and that about a week before the day of the assault the sister sewed two brown buttons on the sleeves. Defendant testified that one of them had

been lost, and that he had fastened the sleeve when down with a pin. Black cotton shirts are of the most common apparel worn by working men, and, while it is possible that the microscopical test was sufficient to prove that the fragment in the button came from the same weave as the piece from which the shirt was made, thousands of such garments may have been made from the same weave. The button was picked up on the day following the assault, and several if not many persons had visited the place. It was not the size or kind suitable for a workingman's shirt, and we regard the evidence as too remote to bear upon the question of defendant's identity.

Reversed.

BROWN, J. (dissenting).

In my opinion all the statements and declarations shown in the record to have been made by complainant soon after the commission of the crime, relative to the identity of the perpetrator, were properly received in evidence as part of the res gestæ. I do not concur in the distinction applied by the court between the statements made before and those made immediately after complainant's baby had been restored to her. All were made within an hour after the commission of the crime, and under circumstances tending to vouch for their truthfulness.

ELLIOTT, J. (dissenting).

I cannot bring my mind to the conclusion that a new trial should be granted in this case. Possibly some of the evidence referred to in the opinion should have been excluded, but the identification of the defendant was so complete without it that in my judgment the verdict should stand. I therefore respectfully dissent.