## STATE v. PEDER H. QUINNILD.[1]

April 28, 1950.

No. 35,123.

*Garfield H. Rustad,* for appellant.

*J. A. A. Burnquist,* Attorney General, and *G. L. Dosland,* County Attorney, for the State.

FRANK T. GALLAGHER, JUSTICE.

Defendant appeals from an order of the district court denying him a new trial after his conviction under an information charging him with carnal knowledge and sodomy in connection with a male child under the age of 16 years.

The testimony, which was uncontradicted, showed the following: The complaining witness, a boy aged 13 years at the time involved, was working as a laborer at Moorhead with his father's construction crew. He lived in a bunkhouse with the other members of the

[1]Reported in 42 N. W. (2d) 409.

crew adjacent to a housing development project on which the crew was engaged. The boy's father also stayed at the bunkhouse when he was in Moorhead. During the time that the father was not there, the boy was in charge of the crew's foreman, Eugene Becker, and Ed Johnson. The boy, who was rather large for his age, was described as intelligent and a good worker.

Defendant lived in a house about one-half block east of the bunkhouse. One or two nights previous to the night of the offense charged, defendant and another man had inspected one of the houses in the development in the company of the complaining witness and foreman Becker.

The complaining witness testified that on the evening of July 15, 1948, he was sitting outside the bunkhouse with some other men when he heard defendant playing an accordion with a loudspeaker attachment in the latter's home not far away. The music stopped at about 7:30 that evening, and shortly afterward defendant came over to the bunkhouse and invited the boy to come with him to his home and listen to him play the accordion. The boy obtained permission from one of the crew present and accompanied defendant to his home. He testified that upon entering the home he heard voices in the basement and was informed by defendant that a young couple lived down there. The boy and defendant then entered the living room of defendant's home, where the latter set up his accordion and played and sang several songs. After a while, defendant put aside the accordion and sat down next to the boy on a davenport in the room. According to the complaining witness, defendant then pretended to admire the boy's shoes and began to squeeze and caress the boy's leg. The witness said that he attached no particular significance to this incident, but that he did not like it. Attemping to divert defendant, the boy said that he suggested to him that they go upstairs and play an organ which defendant had previously told him he had. The boy said that defendant then "grabbed" him by the hand and led him upstairs, through one bedroom and into defendant's bedroom. The boy claimed that as he was standing there looking at an organ in the room defendant

approached him from behind, put his arms around him, led or carried him to a bed in the room, placed him on it, and held him there. He testified that because of fright he made no effort to escape, and that defendant then committed the act referred to in the information. He said that after a time defendant released him. The boy claimed that after this he rearranged himself, said to defendant to "Play the organ," with the thought in mind of diverting defendant's attention elsewhere, and that defendant then played a few numbers and sang some songs. The boy said that he then told defendant that he had to go home and was permitted to do so, but was admonished by defendant not to "tell anybody because this is just between us men." The boy described his emotions as follows:

"Q. Now, when he did this to you did you get quite scared and excited?

"A. Well, I guess so.

"Q. It is even hard for you to remember, is that right?

"A. Well, I was so—it was so funny to me that he did that thing.

"Q. It shocked you, did it?

"A. Yes, sir."

The complaining witness said that after leaving defendant's home he went back directly to the bunkhouse and greeted Becker and Johnson with "Hi," but made no complaints to them at that time, as he said he was scared. He proceeded at once to take a shower bath, "because I heard of these sicknesses like syphilis and that and I thought maybe I might get it from him." He said that after completing his shower he went to bed. "After I thought for a while about what he did and then I dozed off for a while." He testified that he "all of a sudden woke up with a jerk" at about 11 o'clock that night and that he leaned over the bunk right away and talked with Ed Johnson and told him the story of what he claimed defendant had done to him. This was about an hour and a half or two hours after the time he said that he returned to the bunkhouse

from defendant's home. The boy said that Eugene Becker, the foreman, came in while he was telling the story to Johnson and that he also told Becker, just as he did on the witness stand, as to what defendant did to him that night. Over defendant's objections, the boy was permitted to repeat in effect what he had said at that time. Becker later took the stand and, over similar objections, was permitted to testify that the boy told him the exact story that night at the bunkhouse as he testified. Becker also testified that as foreman of the crew he "sort of had" care of the boy when the latter's father was gone, and that he was present at the bunkhouse when the boy returned from defendant's home about 9:30 of the evening in question. When asked whether he observed any indication of fear, anxiety, or excitement on the part of the boy when he told him the story, Becker replied that there was plenty of excitement after the boy awakened, and that he noticed there was something unusual or wrong with the boy when he came home that night.

Before the court charged the jury, defendant moved for a dismissal upon the ground that the state had failed to prove beyond a reasonable doubt the allegations of the information, and further moved that the testimony of the boy and of Becker be stricken on the ground of no legal corroboration of the testimony of the complaining witness, which motions were denied.

We need only consider whether the hearsay statements made by the boy to Becker or Johnson were properly admitted as part of the *res gestae.* With reference to this, the trial court said in part in its charge to the jury:

"* * * Were his words explanatory of that transaction? Were those words spoken under such circumstances or excitement still continuing as to show that they were spontaneous and not the result of deliberation or design? If so, then his disclosure to Ed Johnson was a part of the res gestae for your consideration along with all of the evidence in the case. If his disclosure was a narrative of facts and not facts speaking through him, then you will disregard the evidence pertaining to his disclosure to Ed Johnson."

Defendant cites State v. Alton, 105 Minn. 410, 117 N. W. 617, 15 Ann. Cas. 806, as controlling, and the state also cites this case in support of its position. In that case, the prosecutrix was criminally assaulted while wheeling her child in a baby carriage in a somewhat secluded spot. She was choked into insensibility and, upon regaining consciousness, found that the child and its carriage were missing. In the course of half an hour, she approached a house about half a mile away in a greatly exhausted and excited condition, crying and screaming. She made a statement to the person who came to her assistance to the effect that someone had knocked her down and had stolen or killed her baby. She repeatedly called upon the people present to find the baby, exclaiming, "A man tried to kill me and my baby." The child was found and returned to her, after which she was taken into the house. It was held there that all declarations made by the prosecutrix up to the time her child was restored to her were properly admissible in evidence as a part of the *res gestae,* but that it was error to receive in evidence statements and declarations which were subsequently made by her, not in the presence of defendant, after she entered the house. This court further said in that case, after reviewing to some extent positions taken by other courts (105 Minn. 416, 117 N. W. 619):

"* * * we are strongly impressed with the view that the rule should be liberally applied, at least in cases of accident or personal injury, when the party is suffering from bodily pain or mental anguish. Neither the length of time intervening nor the place of the declaration are necessarily controlling. If under all the circumstances of a given case it can reasonably be said that the declaration is probably true, it may be submitted for the consideration of the jury with proper instructions."

In distinguishing between the admission of the declarations made up to the time the prosecutrix found her child and the exclusion of statements and declarations made after she entered the house, the court there said in effect that in the first instance she was in

no state of mind to reflect and consider and plan a false story; that her condition and manner of expression were not consistent with the attitude of one who was telling the story of a past event; that her call for help and her endeavor to direct attention to the man were as much a part of the transaction itself as though they were uttered at the very instant of the attack; that they were produced by and grew out of the assault, would not have been otherwise uttered, and that therefore they must be considered as part of the *res gestae.* In refusing to admit the statements made after the mother and child had been reunited, the court took the position that sufficient time had then passed to permit the witness to deliberate upon what had taken place; the strain had been relieved; the reaction had come; there was time for reflection and a comparison of events; she was then more or less subject to the opinions and suggestions of those around her; (105 Minn. 417, 117 N. W. 620) "and there was lacking that involuntary, spontaneous manner which before had characterized her expressions."

In Roach v. G. N. Ry. Co 133 Minn. 257, 158 N. W. 232, we held that the court did not err in receiving in evidence as a part of the *res gestae* statements made by deceased at a time which was not exactly shown, but which could have been as long as 45 minutes after the accident, when it appeared that at the time he made the statements deceased was suffering intense pain and had so suffered from the time of the accident; that there had been some excitement in connection with the accident; and that the circumstances on the whole tended to indicate an absence of fabrication and to accredit the statements as trustworthy.

In Clark v. Davis, 153 Minn. 143, 190 N. W. 45, the question was raised as to the admissibility of certain evidence. Decedent was severely injured in a railway accident. The evidence sufficiently established the fact that he made statements to his sister and mother after coming out from under the influence of ether in which he stated the manner in which he was hurt. This court held that these statements were properly received in evidence as part of the *res gestae.* Decedent's left leg and right arm had been severely

crushed. He was immediately taken some distance to a hospital. There was evidence that he was in extreme pain and agony; that an operation was performed three-quarters of an hour after the accident; and that decedent was unconscious until about the time of making the statements. This court there said (153 Minn. 146, 190 N. W. 46):

"* * * The question whether statements are to be received as part of the res gestae is often difficult to determine. * * * There is a large element of discretion in the trial court. Such statements are received, if at all, on much the same principle as we receive exclamations of pain. To be received there must be some startling occurrences calculated to produce nervous excitement and spontaneous utterances. The utterances must spring out of the transaction, must be spontaneous, generated by an excited feeling which extends without break or let down from the moment of the event to the moment of the utterance, and under such circumstances as to reasonably preclude the idea of calculation of deliberate design. * * *

*    *    *    *    *

"There is no arbitrary time line. The utterance must simply have been made before there has been time, or rather opportunity, to contrive and misrepresent, before the exciting influence of the act has become dissipated, 'while the nervous excitement may be supposed still to dominate and the reflective power to be yet in abeyance.' 3 Wigmore, Ev. § 1750; Mitchum v. State, 11 Ga. 615, 626; Carr. v. State, 43 Ark. 99, 104; Kennedy v. Rochester City & B. Ry. Co. 130 N. Y. 654, 656, 29 N. E. 141; see also O'Connor v. Chicago, M. & St. P. Ry. Co. 27 Minn. 166, 6 N. W. 481, 38 Am. St. 288; State v. Alton, 105 Minn. 410, 117 N. W. 617, 15 Ann. Cas. 806; Lambrecht v. Schreyer, 129 Minn. 271, 152 N. W. 645, L. R. A. 1915E, 812; Meyer v. Travelers Ins. Co. 130 Minn. 242, 153 N. W. 523; Roach v. Great Northern Ry. Co. 133 Minn. 257, 158 N. W. 232."

It is little wonder that trial courts are at times in doubt whether certain statements should be excluded under the hearsay rule or admitted under the exception as part of the *res gestae,* since there seems to be no precise rule determining just when statements are part of the *res gestae.* The lawbooks contain many cases on the subject, but none of these cases, or the text writers who have reviewed them, appear to have deduced from the decisions any exact rules or principles from which it may be determined with a positive degree of certainty just when certain statements or declarations may be considered as coming within the *res gestae* rule. While the general doctrine of *res gestae* is well understood by the courts, its application has been difficult. In this respect this court said in Roach v. G. N. Ry. Co. 133 Minn. 260, 158 N. W. 234:

"'* * * 'Each case must depend upon its own peculiar circumstances, and be determined by the exercise of sound judicial discretion.' Gilfillan, C. J., in O'Connor v. Chicago, M. & St. P. Ry. Co. 27 Minn. 166, 6 N. W. 481, 38 Am. Rep. 288. 'In determining whether the statement made is part of the *res gestae* * * * the trial court has a wide range of discretion.' Hallam, J., in Lambrecht v. Schreyer, 129 Minn. 271, 152 N. W. 645, L. R. A. 1915E, 812. The discretion or judgment of the trial court is not absolute. It is reviewable by this court. See State v. Alton, 105 Minn. 410, 117 N. W. 617, 15 Ann. Cas. 806; Hyvonen v. Hector Iron Co. 103 Minn. 331, 115 N. W. 167, 123 Am. St. 332; State v. Horan, 32 Minn. 394, 20 N. W. 905, 50 Am. Rep. 583."

Upon a review of the record in the case at bar, it is our opinion that under the circumstances here the objected-to statements of the boy made to Johnson or Becker an hour and a half or two hours after the happening of the crime set out in the information were not admissible as a part of the *res gestae.* For example, we have a different fact situation here from that in the Alton case, since the statements admitted there as a part of the *res gestae* appear to have been made by the prosecutrix to the first persons she met after she had been brutally assaulted and while still nearly

crazed with the thought of injury to or loss of her child. The court there concluded that at that time she was in no state of mind to recall, consider, and plan a false story and that her condition and manner of expression were not consistent with the attitude of one who was telling the story of a past event.

While we have no reason in the case at bar to question the story of the boy as purportedly told to Johnson or Becker, the fact still remains that when he returned from defendant's home to the bunkhouse at about 9:30 that evening he said nothing to anyone, except perhaps to give a casual greeting. It is true that Becker testified he noticed that there was something unusual or wrong with the boy when he came into the bunkhouse that night, but apparently it was not so noticeable as to warrant any further inquiry at that time on the part of Becker or others who observed him. The boy then took a shower bath and went to bed. He claimed that after doing so he thought about the matter for a while and then went to sleep. He still said nothing to anyone about the matter while he was thinking of it and prior to the time he went to sleep. It was not until after he awakened at about 11 o'clock, an hour and a half or two hours after the happening of the alleged crime, that he told anyone about it. It is possible that the boy may have been ashamed or reluctant to mention his experience when he first returned to the bunkhouse, but it must be remembered that he was among friends in the crew and that he had ample opportunity to tell them of the affair as soon as he entered the bunkhouse. It also appears that after he had completed his bath and during the time that he was thinking the matter over before falling asleep he also had further opportunity to relate the incident to Johnson or Becker, who apparently were near him. It can hardly be said under the facts here that at the time the statements were made they were produced by nervous excitement and were spontaneous utterances generated by an excited feeling which extended without a break or letdown from the time the alleged crime was committed to the time the statements were made. While we have no way of knowing whether the boy's testimony as to the crime complained of,

standing alone, might have brought about the verdict reached by the jury, it is our opinion that the testimony objected to was not admissible as part of the *res gestae* and that a new trial should be granted.

Reversed.