## STATE v. ROBERT JOSEPH SCHWARTZ.

122 N. W. (2d) 769.

July 19, 1963—No. 38,419.

*John A. Cochrane,* for appellant.

*Walter F. Mondale,* Attorney General, *Charles E. Houston,* Solicitor General, and *W. D. Prindle,* County Attorney, for respondent.

FRANK T. GALLAGHER, COMMISSIONER.

Appeal from an order of the district court denying defendant's motion for a new trial.[1]

A complaint was brought against defendant in the municipal court of Montevideo, Minnesota, by the sheriff of Chippewa County alleging the crime of rape and assault. Defendant's special appearance on the ground that he was illegally arrested was overruled. He was bound over for trial in district court and an information charging him with the crime of rape under Minn. St. 617.01 was filed December 7, 1959.

The case was tried before a jury, and defendant was found guilty and a judgment of conviction was entered December 23, 1959, on which date he was committed to the State Reformatory at St. Cloud.[2] Thereafter defendant moved for a new trial, which was denied.

The case arose out of incidents occurring on the night of October 24, 1959, at the Fiesta Ballroom, a public dancehall on Trunk Highway

---

[1]Although defendant states in his brief that it is an appeal from an order denying a motion for a new trial and from the judgment of conviction, the notice of appeal on file in this court is limited to the order denying a new trial.

[2]According to defendant's brief he was released after serving some 2 years of his sentence.

No. 7 just east of Montevideo. The defendant and three companions, Jeffrey Micko, David Lynch, and George Schlecht, hunted pheasants in the Montevideo area during the afternoon of that day. That evening they visited the ballroom, returned to Montevideo to purchase some liquor, and then came back to the dancehall, arriving at about 9:30 p. m.

The alleged victim, who was 18 at that time, testified that she arrived at the ballroom in company with five other persons sometime between 9 and 9:30 that evening. At about 10 p. m. she met the defendant at the ballroom and danced with him twice. She talked with him and others in his booth for approximately a half hour and then returned to the "Wood Lake booth" where her companions were sitting. She stated that during the time she was in the ballroom she had three drinks of gin and sour. She said that although she was feeling the liquor she was not sick and did not stagger. She described the clothing she was wearing that evening—a gray wool skirt, a white, short-sleeved blouse and black cardigan sweater, black shoes, two pairs of underpants, a bra, slip, girdle, and a pair of nylons. Although the witness could not positively identify state's exhibit G, a turquoise-colored man's shirt, she said defendant was wearing a turquoise blue shirt with a collar darker than the shirt and dark trousers.

She said that she and the defendant left the ballroom at about 11:15 p. m. She had asked two girl friends to go with her to the car as she decided to go home early. She explained that she did not wait for her girl friends but walked out the east door of the ballroom with the defendant, intending to go to the car in which she had come to the dance, which was parked to the left around the building. Instead of going left she went to the right and got into the back seat of defendant's car with him. She stated that she walked there of her own free will; that defendant was pleasant company, "polite as any teenage boy"; that he did not threaten her in any way; and that she was not afraid of him. After they got into the car, she said, he put his arm around her and tried to kiss her. She did not scream or "holler," but almost immediately left the car and started back toward the building. She testified that she was running away from him as fast as she could, as she wanted to get back into the dance-

hall. While she was running, she said, she heard running footsteps. Someone hit her. She did not know who it was as she lost consciousness from that moment until she was in the hospital.

James Haugen, a witness for the state, testified that he was at the Fiesta Ballroom on the night of October 24, and that he left the ballroom with three companions at about 12 midnight and went to his car, which was parked in the northwest corner of the parking lot. As he backed his car to leave, he noticed a girl lying between two cars in the same row in which he had been parked. He and the others got out of his car, and went over to the girl (who later was identified as the complaining witness). She was lying on her back with her head towards the · ballroom. The left side of her face was swollen, her clothes disarranged, her skirt was pulled above her knees, and her sweater and blouse were also pulled up. She was not conscious. The witness said that he noticed a small amount of blood on the left corner of her mouth. When he picked her up, Haugen said her legs were cold, that she did not have any shoes or stockings on, and that her feet were muddy. He carried her to the north side of the ballroom and delivered her to a policeman on duty. The witness said that while he carried her, she moaned a few times but that her words were mostly unintelligible. He smelled no alcohol on her, but there was other testimony that she had been drinking.

Waldemar Scherer, who was with Haugen at the time, gave substantially the same testimony as to where the girl was found and her condition. He also said she was not conscious at the time but that she emitted some low groans which he could not understand.

Dr. Norman L. Hagberg, a witness for the state, testified that he first examined the complaining witness at the hospital in Montevideo shortly after midnight on the night involved and that when she was admitted she wore a white blouse, a black buttoned sweater, and a gray skirt but no panties or girdle and no shoes. He noticed some blood on her clothes, bright red blood on the bottom of her slip, and some drops of blood on her blouse; also some blood around her lips. He observed lacerations of the lining of the mouth. She also had a swelling on the left cheek which was beginning to discolor. She was transferred to a room in the hospital where he again examined her. The doctor said she was

unresponsive to questions at that time. On examination the doctor found that her ears were normal; that there was no evident fracture of her nose; that the pupils of her eyes were round and regular; that there was no evidence of intercranial damage; that her chest was clear, there being no evidence of external trauma such as lacerations or abrasions and no evidence of internal difficulty; and that her blood pressure was 120/90. Examination of the abdomen was essentially negative. He noted that she had bright red blood over the perineum and down the legs. An examination of the female organs disclosed two sources of blood, one being menstrual flow from the uterus and the other being bright red blood from a little tear about an inch long on the back side of the vagina, right at the entrance. He stated that he took a specimen from the vaginal canal and examined it microscopically for sperm but found none. It will serve no useful purpose to go into details in connection with the doctor's examination of his patient except to say that it was his opinion that the vaginal tear was probably caused by sexual intercourse at a time when she was not prepared for it.

Defendant raises numerous assignments of error. We shall consider the ones which we deem pertinent to this opinion. He first claims that the municipal court erred in binding him over for trial because, according to him, the preliminary examination did not show probable cause that he committed the offense.

It is well established in this jurisdiction that the function of the magistrate at the preliminary examination is to determine only whether sufficient evidence has been produced to establish probable cause that the defendant is guilty of a public offense and is not to determine his guilt or innocence. State ex rel. Hastings v. Bailey, 263 Minn. 261, 116 N. W. (2d) 548, and cases cited. A preliminary examination is not a trial; instead it is an inquiry to determine whether there is sufficient ground to hold the accused for trial. State ex rel. Krinkie v. Felix, 171 Minn. 140, 213 N. W. 556. We find no reversible error on that assignment.

Defendant contends that the trial court erred in not declaring a mistrial on its own motion when it was disclosed that one of the jurors who became ill at the trial was treated by the same doctor who attended the

complaining witness and testified at the trial. It appears that the matter was brought to the attention of the court and counsel; and also that counsel for the defense then acquiesced in going forward "at this time." In the motion for a new trial the incident was urged as a ground for a new trial.

There is no showing here that the doctor, while attending the sick juror, did or said anything to influence him in connection with the case. Ordinarily it is within the discretion of the trial court to determine whether anything irregular or improper took place. We shall refer to the matter later in our summary of the assignments of error.

Defendant claims that the trial court erred in allowing Dr. Hagberg to express his opinion. Great discretion rests with the trial court in the application of the rule as to the propriety of expert testimony. The mere fact that the opinion of the expert covers the same issue which the jury has to pass upon does not call for its exclusion. State v. Cox, 172 Minn. 226, 215 N. W. 189.

Another assignment of error pertains to the closing argument of the county attorney. Defendant claims that it was prejudicial error for the prosecutor to express his opinion as to the guilt of the defendant and to call upon the jury to support the sheriff in his final argument. We shall refer to certain parts of the argument.

The county attorney commented that he anticipated that the defense would attempt to show the law enforcement officials who had testified at the trial in an unfavorable light and that this "so far as I am concerned, is to [distract] you from the misdeeds and evil actions of the defendant himself." Referring to how vomitus got on the pants of the defendant he said, "We think that Schwartz, at the place where he dragged [the alleged victim], having previously been drinking and sickened himself by what he had done and vomited on the ground. And the telltale stains remained on his pants." Referring to Dr. Hagberg's testimony on cross-examination that he did not know what caused the tear in the victim's vagina, the county attorney said, "But is there any doubt in your mind as to what Dr. Hagberg's opinion was, as to what caused that tear? There's no doubt in my mind it was caused by sexual intercourse at a time when she wasn't emotionally prepared, namely at a

time when she was unconscious. * * * Dr. Hagberg has an opinion * * *. And I have an opinion. And I am sure that you have an opinion as to what caused that tear * * *." At another point he stated, "And that * * * satisfies me beyond any reasonable doubt that [the alleged victim] had been raped."

We quote further from the statements made by the county attorney:

"* * * It is obvious he has got plenty of reason for lying to the Court and trying to deceive you as to what happened, because he's in court first on a charge of rape. [The alleged victim] can't even testify that she was raped."

"And now I want to talk to you about the impeachment of Schwartz. In the first place [the complaining witness] had no reason to lie, Schwartz has every reason."

"* * * We'll agree that probably the sexual act itself was not performed where Schwartz's car was parked * * * but that doesn't mean that Schwartz didn't do it. * * *

"The conclusions that I present to you are that Schwartz knocked [the alleged victim] into insensibility."

"* * * [I]t stretches the imagination and credibility of sensible people to the breaking point when it is suggested that between the time [the alleged victim] left the car and the time forty feet later on and four seconds later on she was smashed into insensibility, that somebody else intervened other than Schwartz, and struck that blow."

Considerable latitude must be allowed the county attorney in his closing argument and his role at times is a difficult one. In State v. Clark, 114 Minn. 342, 344, 131 N. W. 369, 370, this court said with reference to the duties and obligations of prosecuting officers:

"* * * He is not bound to make his argument to the jury colorless, or argue both sides of the case, if the defendant is represented by counsel; but he may present forcibly the state's side of the case. He is, however, never justified in thrusting his personality into the case, and *expressing his opinion that the defendant is guilty,* or stating as a fact anything except what the evidence tends to prove, or which he in good faith expects

to prove. If he does otherwise, he is guilty of misconduct." (Italics supplied.)

See, also, State v. Gulbrandsen, 238 Minn. 508, 57 N. W. (2d) 419, and cases cited on this point.

Statements by the prosecutor indicating his belief, opinion, or knowledge that the accused is guilty have frequently been considered and adjudicated directly in terms of the prejudicial effect, rather than in terms of their propriety or impropriety. See, Annotation, 50 A. L. R. (2d) 766, § 4. In Minnesota such statements have been held prejudicial if not based on the evidence. State v. DePauw, 243 Minn. 375, 68 N. W. (2d) 223. An expression of opinion may, under some circumstances, however, be prejudicial even though based on the evidence, or may, in combination with other errors or misconduct, require the reversal of a conviction. State v. Cole, 240 Minn. 52, 59 N. W. (2d) 919. While we realize that a closing argument of a prosecutor is to be taken as a whole and that no single phrase is to be taken out of context and used as a basis for reversal, we shall consider it in its entirety in our summary with other alleged errors.

The next assignment of error raised is directed to the propriety of allowing the sheriff to sit at the counsel table and to converse with jurors, and of allowing the bailiff who investigated the case at the Fiesta Ballroom to take charge of the jury during a trial. A similar issue was raised in State v. Schabert, 218 Minn. 1, 15 N. W. (2d) 585, and while that case was reversed on other grounds, we expressly disapproved of the practice of jurors riding to and from the trial with a bailiff who appeared to have an interest in the prosecution and sat at the counsel table with the county attorney during the trial. In a recent Iowa case decided in March 1963, State v. Faught, 254 Iowa 1124, 120 N. W. (2d) 426, the court stated that where the sheriff was an important witness for the state and was in charge of the investigation of the homicide and instrumental in securing much of the evidence presented at the trial, and where the deputy sheriff was also an important witness for the state, neither officer should have transported the jurors, during their deliberations, in automobiles to a restaurant where they all had supper together. The court further said (254 Iowa 1134, 120 N. W. [2d] 432):

"Defendant was on trial for his life. It was imperative that the verdict be based solely on the evidence and the court's instructions. To permit the sheriff and his deputies, under the facts here, to associate with the jurors after the case was submitted, before, during and after the evening meal, was not conducive to that end."

A new trial was granted.

Defendant also claims that the court erred in allowing the state to impeach its own witness without a showing of genuine surprise. It is ordinarily in the discretion of the trial court to determine whether a surprise exists. State v. Lemke, 207 Minn. 35, 290 N. W. 307; State v. McClain, 208 Minn. 91, 292 N. W. 753; State v. Saporen, 205 Minn. 358, 285 N. W. 898. We find no reversible abuse of discretion by the trial court on that assignment.

In his next assignment defendant contends that the court erred in allowing the crime of rape to go to the jury and in referring in its charge to "ravishment." Defendant did not explain, however, just how the use of the term "ravishment" prejudiced the defense. We may assume his claim to be that it tended to incite passion. Viewing the charge in its entirety we find no reversible error under the facts and circumstances here in that point.

In his next assignment it is contended by defendant that the court erred in not striking the testimony of Wilkaan Fong, a crime laboratory analyst, relating to seminal stains on the trousers and blood stains on the shirt as too remote and purely speculative. He cites State v. Alton, 105 Minn. 410, 117 N. W. 617, in support of that contention. There the prosecution attempted to establish the identity of the defendant in a rape case by expert testimony that blood and seminal discharge were found on his clothing. An expert witness from the health department testified that he had subjected a smear apparently blood found on one sleeve of the defendant's shirt to chemical tests, the results of which disclosed in his opinion that it was blood. On cross-examination the witness admitted he could not tell how long the blood had been on the shirt, whether one month, three months, or a year, or if in fact it was human blood. No attempt was made to connect the seminal stain to the alleged rape either. In reversing the conviction, this court held that evi-

dence as to both stains should have been excluded as being too remote —that additional evidence was necessary to prove that the stains originated on the occasion of the crime.

In the instant case, similar evidence was offered for the purpose of identifying the defendant. Police had recovered articles of clothing from defendant's apartment upon which were found specimens of blood and seminal discharge. The expert did not give an opinion as to age of the specimens so as to link them to the commission of the crime, nor in other ways establish their connection to the crime. It would seem that due to the inflammatory nature of this type of evidence and its tendency to incite passion or prejudice that its admission was reversible error.

With the exception of the admission of the testimony of Mr. Fong, we would not consider any assignment of error hereinbefore referred to as sufficient in itself to justify a new trial. However, in the light of the seriousness of the crime involved, and the natural repulsion most people feel for it, we shall consider some of the assignments together to determine whether they might have created sufficient prejudice to affect the fairness of the trial.

Defendant was charged with committing rape on an 18-year-old, unmarried girl. As stated by Mr. Justice Mitchell in State v. Connelly, 57 Minn. 482, 486, 59 N. W. 479, 481, where the defendant was granted a new trial after his conviction of the crime of rape on a 17-year-old girl:

"The crime is so abhorrent that, to some minds, to charge a person with it, raises a presumption of guilt. It is human nature to incline to the story of the female, especially if a young girl. * * *

"Hence all the authorities agree that this is a crime requiring special scrutiny by the jury, and a careful weighing of the evidence and all remote and near circumstances and probabilities in cases where the testimony of the female is not corroborated, * * *."

In the instant case we have a combination of incidents which, taken together, might have created prejudice in view of the crime charged. We have the doctor who treated the alleged victim and testified at the trial also attending one of the jurors who became ill. We have some statements of the county attorney in his argument which could be considered

somewhat objectionable under the circumstances here. We have an affidavit from defendant's counsel that at the time of the trial he "objected to the fact that Hans Strand, the sheriff of Chippewa County, was directing the procedure of the case in behalf of the State, sitting behind the county attorney." It also appears that Norman Joss, the deputy bailiff assigned to take charge of the jury during the trial, was one of the first officers at the scene of the crime; that he took part in the investigation of the events and took the alleged victim to the hospital that night. Mr. Strand in an affidavit states that from the time the jury was called until the verdict was returned, he "made a particular effort not to associate with any members of the jury nor engage any member of the jury in conversation other than the requirements of common decency and courtesy and only in such cases to the extent of greeting the jurors in a casual manner in response to recognition by them." He "specifically denies having lunch with the jury panel or any members of same and specifically denies carrying on conversations with the jurors or any of them relative to the trial." We realize that sheriffs, deputy sheriffs, bailiffs, and other law enforcement officers must necessarily be in some contact with the prosecuting attorney as well as jurors during the course of a criminal trial. In most cases they are capable, sincere men and women trying to perform their duties in an honest manner. However, they must exercise great care in the performance of their duties to see that defendants in criminal cases, and litigants in all cases, receive fair trials.

It is our opinion, under the facts and circumstances here, that, because of the admission of certain objectionable testimony by Mr. Fong and other incidents above referred to which occurred at the trial, in the interests of justice a new trial should be granted.

Reversed and new trial granted.